WIENER, Circuit Judge:
After this panel filed a unanimous opinion affirming the district court and a judge on this court then held the mandate, a panel member changed her position from agreeing to affirm the district court to advocating reversal. We therefore withdraw our original, unanimous opinion and replace it with two opinions: this one from the panel majority and another from our now-dissenting panel member.
NARROW FRAMEWORK
First, the one and only act of the district court that is at issue in this appeal is its temporary injunction, granted at the outset of this litigation to preserve the status quo among all the parties pending resolution of the substantive issues of this case. The parties to whom we refer are the defendant, the State of Louisiana, and the plaintiffs, Planned Parenthood of Gulf Coast, Incorporated (“PPGC”) and three of its patients, each of whom is so financially disadvantaged as to qualify for Med *450 icaid. The district court granted its injunction in recognition of the fact that, if the State’s revocation of PPGC’s Medicaid qualification was to become effective immediately, only to be reversed after months or years of litigation, the clinics’ poorest patients would nevertheless have suffered permanent harm.
Second, the State is not attempting to completely shut down the two PPGC clinics in question; it seeks only to deny Medicaid coverage for the clinics’ treatment of their most needy patients, i.e., those who qualify for Medicaid. It is only that threatened act of the State that the district court has temporarily enjoined pending the orderly disposition of the Medicaid issue in this litigation. The merits of this case are not now before us; this litigation has not even reached the summary judgment stage, much less the merits, but only the initial, Rule 12(b) stage.
Third, neither of PPGC’s two Louisiana clinics threatened here with Medicaid de-certification by the State performs abortions or has ever participated in a program involving donation of fetal tissue. We emphasize this facet of the litigation’s framework for the benefit of those of our colleagues and our readership whose overarching anathema to Planned Parenthood is grounded in their opposition to abortions or donations of fetal tissue, or both.
It is within this narrow framework that we now address the sole issue of this appeal, the district court’s pre-merits, status quo, injunction.
BACKGROUND
Medicaid’s free-choice-of-provider provision, 42 U.S.C. § 1396a(a)(23), guarantees that Medicaid beneficiaries will be able to obtain medical care from the qualified and willing medical provider of their choice. In response to secretly recorded videos released by the anti-abortion Center for Medical Progress depicting conversations •with employees of an unrelated Planned Parenthood in a different state, Defendant-Appellant Louisiana Department of Health and Hospitals (“LDHH”) terminated only the Medicaid provider agreement of Plaintiff-Appellee PPGC, leaving it licensed to provide its services to any and all non-Medicaid patients. PPGC and the individual Plaintiffs-Appellees Jane Doe #1, Jane Doe #2, and Jane Doe #3 (the “Individual Plaintiffs”) — women who are Medicaid beneficiaries and receive medical care provided at one of PPGC’s Louisiana facilities — (collectively “the Plaintiffs”) filed this suit against LDHH under 42 U.S.C. § 1983, alleging violations of 42 U.S.C. § 1396a(a)(23) and the First and Fourteenth Amendments of the U.S. Constitution. Each Individual Plaintiff seeks to continue receiving care from PPGC’s facilities, and each specifically contends that LDHH’s termination action will deprive her of access to the qualified and willing provider of her choice, in violation of Medicaid’s free-choice-of-provider provision.
The district court entered a preliminary injunction against LDHH’s termination of PPGC’s Medicaid provider agreements pending the eventual outcome of this litigation on the merits. LDHH appeals.
FACTS
A. Plaintiffs-Appellees
1. PPGC is a non-profit corporation domiciled in Texas and licensed to do business in Louisiana. It operates two clinics in Louisiana: the Baton Rouge Health Center and the New Orleans Health Center. Both centers participate in Louisiana’s Medicaid program. PPGC’s two clinics provide care to over 5200 Medicaid beneficiaries, who comprise more than half of the patients they serve in Louisiana. Both clinics offer physical exams, contraception and contra *451 ceptive counseling, screening for breast cancer, screening and treatment for cervical cancer, testing and treating specified sexually transmitted diseases, pregnancy testing and counseling, and other listed procedures, including colposcopy. Again, neither clinic performs abortions nor has either ever participated in a fetal tissue donation program.
2. Doe #1 relies on PPGC’s health center in Baton Rouge for her annual examinations. According to Doe #1, PPGC also helped her obtain treatment for cancer in December 2013. Her cancer is now in remission, but it has rendered her unable to take birth control pills. She does not wish to have any more children and continues to rely on PPGC to advise her on future contraception options. Doe #1 wishes to continue receiving health care at PPGC because she does not know of any other providers that will take her insurance. She prefers to receive care at PPGC because she is comfortable with the staff, trusts the providers, and is easily able to make appointments.
3. Doe #2 is enrolled in Louisiana’s Take Charge Plus program[1] and has received care at PPGC’s health center in New Orleans since 2012. Until health issues left her unable to work full time, at which point she lost her private health insurance, Doe #2 had used a private obstetrician-gynecologist. That physician stopped treating Doe #2 once she lost her private insurance. Doe #2 now visits PPGC every year for her annual gynecological examination. She prefers to continue receiving it from PPGC and does not know where else she could obtain this care under Medicaid.
4.Doe #3 is a patient of PPGC’s health center in Baton Rouge. There, she receives pap smears, testing for sexually transmitted diseases, and cancer screenings. Doe #3 prefers receiving care at PPGC and finds it is easy to make appointments there. She states that it “is very difficult to find doctors in Baton Rouge who will accept Medicaid.” Doe #3 needed to visit another Baton Rouge clinic for a necessary gynecological procedure, but was given an appointment for a day seven months later.
B. History
In July 2015, the anti-abortion Center for Medical Progress, released a series of undercover videos and allegations purporting to show that Planned Parenthood and its affiliates were contracting to sell aborted human fetal tissue and body parts. At a later hearing, the district court found that “none of the conduct in question [depicted in the videos] occurred at PPGC’s two Louisiana facilities.” Nevertheless, then-Louisiana Governor Bobby Jindal directed LDHH and the State Inspector General to investigate PPGC.
On July 15, 2015, then-secretary of LDHH, Kathy Kliebert, wrote to PPGC requesting responses to a range of questions about its activities. PPGC promptly responded on July 24, 2015, relevantly stating that (1) it “does not offer abortion services,” and (2) it does not sell or donate any unborn baby organs or body parts. PPGC acknowledged that Planned Parenthood Center for Choice, Inc. (“PPCFC”), a separate corporation,[2] provides abortions *452 in Texas, but that PPCFC does not operate a fetal tissue donation prograna.
Secretary Kliebert wrote to PPGC on August 4, 2015, claiming that several of PPGC’s responses “directly contradict” the recently released videos. According to her, one video taken in Houston, Texas, depicted Melissa Farrell, Director of Research at PPGC, “discuss[ing] existing contracts for fetal tissue donation for the purpose of research.” Secretary Kliebert emphasized that LDHH “is extremely concerned that [PPGC or PPCFC], or both have not only participated in the sale or donation of fetal tissue, but also deliberately misinformed [LDHH] about this practice in its July 24 response letter.” In that same letter, Secretary Kliebert requested more information about the practices of PPGC and PPCFC.
PPGC responded on August 14, 2015, repeating that neither PPGC nor PPCFC sells or donates fetal tissue. PPGC explained that the secretly recorded conversation “does not discuss existing contracts for fetal tissue donation,” but rather, “concerns a list of tissue specimens a major Texas research institution had expressed interest in obtaining, in discussions about a possible future fetal tissue donation program.”
In the midst of these communications, LDHH notified PPGC on August 3, 2015, that it would terminate PPGC’s Medicaid provider agreements. Secretary Kliebert stated no basis for the termination. She noted only that under La. R.S. § 46:437.11 the provider agreements are voluntary contracts subject to termination “by either party 30 days after receipt of written notice.” That same day, then-Governor Jindal published the following press release: “Governor Jindal and DHH decided to give the required 30-day notice to terminate the Planned Parenthood Medicaid provider contract because Planned Parenthood does not represent the values of the State of Louisiana in regards to respecting human life.” Secretary Kliebert’s letter notified PPGC of its right to a hearing and stated that PPGC may request an administrative appeal within 30 days. At a subsequent hearing before the district court, LDHH’s counsel clarified that this termination action by the state did not relate to PPGC’s ability to continue providing adequate care to its non-Medicaid patients.[3]
C. The Instant Proceedings
On August 25, 2015, the Plaintiffs filed suit under 42 U.S.C. § 1983, contending that LDHH’s termination of PPGC’s Medicaid provider agreements violated Medicaid’s free-choice-of-provider requirement, 42 U.S.C. § 1396a(a)(23), and the U.S. Constitution. On that date, the Plaintiffs also moved for entry of a temporary restraining order and preliminary injunction, which the district court eventually granted. The validity of that preliminary injunction is the one and only issue of this appeal.
LDHH voluntarily rescinded the August 4, 2015 “at will” termination letters on September 14, 2015. On that same day, LDHH advised the district court by letter that it believed that the Plaintiffs’ claims and pending motions were now moot. But *453 the very next day, September 15, 2015, LDHH notified PPGC that it was “terminating/revoking” PPGC’s Medicaid provider agreements for “cause” under La. R.S. §§ 46:437.11(D)(2) and 437.14, and Title 50 of the Louisiana Administrative Code. LDHH also informed PPGC that it could request an informal hearing or suspensive administrative appeal within 30 days (PPGC has not requested either a hearing or an administrative appeal). LDHH further notified PPGC that the effected terminations would be suspended during this 30-day period.
LDHH has advanced three grounds for termination. First, LDHH identified PPGC’s settlement of a qui tam False Claims Act (“FCA”) claim in Reynolds v. Planned Parenthood Gulf Coast, Inc.,[4] — in which PPGC disclaimed all liability — and its failure to notify LDHH of that settlement and any corresponding violations. LDHH categorized these acts as “fraud.” LDHH identified a second qui tam FCA claim against PPGC in Carroll v. Planned Parenthood Gulf Coast .[5] At the time of the proceedings before the district court in the instant case, the court in Carroll had denied PPGC’s motion to dismiss. LDHH identified the Carroll suit as another example of PPGC’s failure to comply with applicable laws and to notify LDHH of such violations. PPGC subsequently settled that suit, again disclaiming all liability.
Second, LDHH stated that PPGC’s responses in its July and August letters contained misrepresentations. LDHH did not identify any particular misrepresentations either in its August 3 termination letter or before the district court. At most, LDHH urged that PPGC’s responses differed from the content of the videos released by the Center for Medical Progress.
Finally, LDHH claimed that PPGC was subject to termination because it was being investigated by LDHH and the Louisiana Office of Inspector General.
On October 7, 2015, the Plaintiffs filed a motion to amend their complaint, seeking to continue asserting their claims under Medicaid’s free-choice-of-provider provision and to add claims under the First and Fourteenth Amendments of the U.S. Constitution. Two days later, the Plaintiffs also renewed their request for a temporary restraining order and preliminary injunction.
LDHH moved to dismiss the Plaintiffs’ amended complaint under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). After a hearing on the parties’ motions, the district court granted in part the Plaintiffs’ motion for temporary restraining order and preliminary injunction and denied LDHH’s motion to dismiss. The district court held a subsequent telephone conference with the parties, at which point both sides consented to converting the temporary restraining order to a preliminary injunction to allow for an immediate appeal. The parties agreed that no evidentia-ry matters required further discovery.
The district court issued an amended ruling and order in October 2015, granting the Plaintiffs’ renewed motion for temporary restraining order and for preliminary injunction and denying LDHH’s motion to dismiss. The district court thus preliminarily enjoined LDHH from terminating PPGC’s Medicaid provider agreements during the pendency of this litigation. In a lengthy and detailed opinion, the district court rejected LDHH’s standing, ripeness, and abstention challenges to the Plaintiffs’ claims. The court also found sufficient grounds to issue a preliminary injunction *454 on the basis of the Individual Plaintiffs’ claim under Medicaid’s free-choice-of-provider provision. The district court specifically held that 42 U.S.C. § 1396a(a)(23) affords the Individual Plaintiffs a private right of action enforceable under 42 U.S.C. § 1983. The court expressly declined to determine whether PPGC possesses such a right. The court then held that the Individual Plaintiffs’ claims are substantially likely to succeed and that the remaining factors — irreparable injury to the Plaintiffs, balancing of the injury to the Plaintiffs versus the harm to the defendant, and the public interest — weigh in favor of issuing a preliminary injunction.
LDHH appealed, contending that the district court erred in concluding that the Individual Plaintiffs have standing and that their claims are ripe for review. It further asserts that the district court érred in entering a preliminary injunction.
JUSTICIABILITY
Article III of the U.S. Constitution extends the federal judicial power to “Cases” and “Controversies.”[6] The justiciability requirements of standing and ripeness animate Article Ill’s cases-and-controversies requirement in this appeal. LDHH maintains that the Plaintiffs lack standing to bring their claims and that their claims are not ripe for review. The district court issued the preliminary injunction as to the Individual Plaintiffs’ claims alone, so we confine our analysis to the justiciability of those plaintiffs’ claims.[7]
A. Standing
LDHH first avers that the Individual Plaintiffs lack standing to assert their claims. We review challenges to standing de novo.[8] To establish standing, a plaintiff must prove that (1) he has sustained an “injury in fact” that is both (a) “concrete and particularized” and (b) “actual or imminent, not conjectural or hypothetical,” (2) there is “a causal connection between the injury and the conduct complained of,” and (3) a favorable decision is likely to redress the injury.[9] “An allegation of future injury may suffice if the threatened injury is certainly impending or there is a substantial risk that the harm will occur.”[10]
LDHH posits that the Individual Plaintiffs have failed to demonstrate an injury because PPGC’s Medicaid provider agreements have not yet been terminated and the Individual Plaintiffs have not yet been denied access to PPGC’s services. LDHH further maintains that any injury will result not from its actions, but from PPGC’s failure to avail itself of its administrative appeal rights.
The Individual Plaintiffs counter that they have standing because LDHH has acted to terminate PPGC’s Medicaid provider agreements, which will (1) deny them access to the healthcare services they seek and (2) deny them a legal right, viz., access to the qualified and willing provider of *455 their choice under 42 U.S.C. § 1396a(a)(23). Stated differently, the Individual Plaintiffs will sustain a concrete and particular injury (denial of services from PPGC and a legal right to the qualified provider of their choice) caused by LDHH (termination of PPGC’s Medicaid provider agreements) that will be redressed by a favorable decision (an injunction barring LDHH from terminating PPGC’s Medicaid provider agreements).
At the heart of LDHH’s challenge to the Individual Plaintiffs’ standing is its insistence that, because PPGC’s Medicaid provider agreements have not yet been terminated, the Individual Plaintiffs have not sustained injury. This argument ignores the well-established principle that a threatened injury may be sufficient to establish standing.[11] As LDHH itself says, “[threatened injury must be certainly impending to constitute injury in fact.”[12] LDHH has notified PPGC that it has terminated PPGC’s Medicaid provider agreements, but has suspended the effect of those terminations pending PPGC’s decision whether to pursue an administrative appeal. PPGC has stated that it will not avail itself of administrative appeal. In other words, LDHH has already acted to terminate PPGC’s Medicaid provider agreements; only the effect of that termination has yet to be implemented. And, importantly, the Individual Plaintiffs have no administrative appeal rights, and they are not subject to (nor could they be) any administrative exhaustion requirement under 42 U.S.C. § 1983.[13] The Individual Plaintiffs thus need not wait to file suit until PPGC is forced to close its doors to them and all other Medicaid beneficiaries.
LDHH also argues that the. Individual Plaintiffs have not and will not sustain any legal injury — presumably even when the termination of PPGC’s provider agreements takes effect — because the Individual Plaintiffs have a right to choose only a “qualified” provider, and PPGC is no longer a qualified provider. This contention' turns on the sole substantive question before us on appeal, and we decline to allow LDHH to bootstrap this issue into our standing inquiry. We also note that a violation of a statutory right, even standing alone, may be sufficient to satisfy the injury requirement: “Congress may create a statutory right of entitlement the alleged deprivation of which can confer standing to sue even where the plaintiff would have suffered no judicially cognizable injury in the absence of statute.”[14]
LDHH finally contends that even if an injury exists, it is not fairly traceable to LDHH. Instead, asserts LDHH, PPGC’s decision not to avail itself of an administrative appeal will alone be the cause of the Individual Plaintiffs’ injury. The Supreme Court has warned against “wrongly *456 equating] injury ‘fairly traceable’ to the defendant with injury as to which the defendant’s actions are the very last step in the chain of causation.”[15] Although injury resulting from “the independent action of some third party not before the court” will not suffice, “that does not exclude injury produced by determinative or coercive effect upon the action of someone else.”[16] LDHH is essentially asking us to conduct a proximate cause analysis to determine the immediate cause of the Individual Plaintiffs’ injuries, but this is not what the Supreme Court requires.[17] We therefore affirm the district court’s determination that the Individual Plaintiffs have standing to pursue their claims.
B. Ripeness
LDHH next asserts that the Individual Plaintiffs’ claims are not ripe. It argues that those claims are not fit for review because no injury has occurred and that the administrative process and the factual development it entails are still pending. LDHH goes so far as to claim that, for an issue to be ripe for review, this court requires a full administrative record.
We review de novo the issue of ripeness.[18] In evaluating whether a case is ripe for adjudication, we balance “(1) the fitness of the issues for judicial decision, and (2) the hardship to the parties of withholding court consideration.”[19] “A case is generally ripe if any remaining questions are purely legal ones.”[20]
We conclude that the Individual Plaintiffs’ claims are ripe for review because the issues before us present purely legal questions. LDHH has already terminated PPGC’s Medicaid provider agreements, and it has proffered three specific grounds for doing so. The operative question on appeal is whether, as a matter of law, any of those grounds permit LDHH to terminate PPGC’s Medicaid provider agreement without violating Medicaid’s free-choice-of-provider requirement. Further, although PPGC had the option to engage in the administrative appeal process, it has elected not to do so. And, as noted by the district court, LDHH had already terminated PPGC’s provider agreements with “its ‘effect’ alone delayed.” LDHH’s own briefing implies the same: “The initial decision maker, the State of Louisiana, through LDHH, has not taken final action on the issue of whether PPGC’s provider contracts were properly terminated.”[21]
The Individual Plaintiffs’ injuries are “sufficiently likely to happen to justify judicial intervention.”[22] The Individual Plaintiffs, as already discussed, are also *457 likely to suffer hardship by being denied access to the provider of their choice under 42 U.S.C. § 1396a(a)(23) and to medical services at PPGC’s facilities. The Individual Plaintiffs’ claims are ripe.
PRELIMINARY INJUNCTION
Concluding that the Individual Plaintiffs have standing to bring their claims and that such claims are ripe for review, we turn to LDHH’s challenge to the district court’s entry of a preliminary injunction.
A plaintiff seeking a preliminary injunction must clearly show
(1) a substantial likelihood that he will prevail on the merits, (2) a substantial threat that he will suffer irreparable injury if the injunction is not granted, (3) his threatened injury outweighs the threatened harm to the party whom he seeks to enjoin, and (4) granting the preliminary injunction will not disserve the public interest.[23]
We “review the district court’s determination on each of these elements , for clear error, its conclusions of law de novo, and the ultimate decision whether to grant relief for abuse of discretion.”[24]
The district court entered a preliminary injunction on the basis of the Individual Plaintiffs’ claims that LDHH’s termination of PPGC’s Medicaid provider agreements violates their free-choice-of-provider rights under 42 U.S.C. § 1396a(a)(23). LDHH raises multiple challenges to the grant of the preliminary injunction. First, it insists that the district court erred in holding that the Individual Plaintiffs claims are substantially likely to succeed because (1) 42 U.S.C. § 1396a(a)(23) does not afford the Individual Plaintiffs a private right of action, and, in the alternative, (2) its termination action does not violate the Individual Plaintiffs’ free-choice-of-provider'rights. Second, LDHH contends that the district court committed clear error in holding that the remaining factors — irreparable injury to the plaintiffs, balancing of the injury to the plaintiffs versus the harm to the defendant, and the public interest — weigh in favor of issuing the preliminary injunction.
A. Substantial Likelihood of Success
We first address whether 42 U.S.C. § 1396a(a)(23) affords the Individual Plaintiffs a private right of action and, if so, whether the Individual Plaintiffs are substantially likely to succeed in their claim that LDHH’s termination of PPGC’s provider agreements runs afoul of that right.
1. Private Right of Action
Joining every other circuit that has addressed this issue, we conclude that § 1396a(a)(23) affords the Individual Plaintiffs a private right of action under § 1983. Medicaid is a cooperative program between the federal government and the states under which the federal government gives financial assistance to states to provide medical services to Medicaid-eligible individuals. The federal government and participating states share the costs of Medicaid.[25] “In return, participating States are to comply with requirements imposed by the Act and by the Secretary of Health *458 and Human Services.”[26] This means that states “must comply with federal criteria governing matters such as who receives care and what services are provided at what cost.”[27] In other words, “Medicaid offers the States a bargain: Congress provided federal funds in exchange for the States’ agreement to spend them in accordance with congressionally imposed conditions.”.[28]
This appeal concerns the contours of the federal Medicaid statute’s free-choice-of-provider requirement, 42 U.S.C. § 1396a(a)(23). That provision mandates that “any individual eligible for medical assistance ... may obtain such assistance from any institution, agency, community pharmacy, or person, qualified to perform the service or services required ... who undertakes to provide him such services.” [29] Discussing this provision in O’Bannon v. Town Court Nursing Center, the Supreme Court explained that it “gives recipients the right to choose among a range of qualified providers, without government interference.”[30] Most recently, the Ninth Circuit explained that “[t]he provision specifies that any individual Medicaid recipient is free to choose any provider so long as two criteria are met: (1) the provider is ‘qualified to perform the service or services required,’ and (2) the provider ‘undertakes to provide [the recipient] such services.’ ”[31]
Because the Individual Plaintiffs assert their claims under 42 U.S.C. § 1983, we analyze whether § 1396a(a)(23) creates a right of action under that statute. Title 42 U.S.C. § 1983 “provides redress only for a plaintiff who asserts a ‘violation of a federal right, not merely a violation of federal law.’”[32] To determine whether a federal statute provides a right of action enforceable under § 1983, we must determine “(1) whether Congress intended for the provision to benefit the plaintiff; (2) whether the plaintiff can show that the right in question is not so Vague and amorphous’ that its enforcement would ‘strain judicial competence’; and (3) whether the statute unambiguously imposes a binding obligation on the states.”[33]
Every circuit court to have addressed this issue, as well as multiple district courts, has concluded that § 1396a(a)(23) creates a private right enforceable under § 1983.[34] The Ninth Circuit in Planned *459 Parenthood Arizona Inc. v. Betlach addressed this question most recently. As to the first element, that court held:
The statutory language unambiguously confers [an individual] right upon Medicaid-eligible patients, mandating that all state Medicaid plans provide that ‘any individual eligible for medical assistance ... may obtain such assistance from any institution, agency, community pharmacy, or person, qualified to perform the service or services required.’[35]
As to the second element, the court held that “[t]he free-choice-of-provider requirement does ‘supply concrete and objective standards for enforcement,’”[36] which are “well within judicial competence to apply.” [37] It recognized that under the statute, Medicaid recipients have the right to choose any provider so long as “(1) the provider is ‘qualified to perform service or services required,’ and (2) the provider ‘undertakes to provide [the recipient] such services.’ ”[38] According to the Ninth Circuit, courts addressing this provision confront “a simple factual question no different from those courts decide every day,” and free from “any balancing of competing concerns or subjective policy judgments.” [39]
In so holding, the Ninth Circuit rejected Arizona’s contention that “qualified,” as used in 42 U.S.C. § 1396a(a)(23)(A), is too vague to enforce. Because the term “is tethered to an objective benchmark”— “qualified to perform, the service or services required” — “[a] court can readily determine whether a particular health care provider is qualified to perform a particular medical service, drawing on evidence such as descriptions of the service required; state licensing requirements; the provider’s credentials, licenses, and experience; and the expert testimony regarding the appropriate credentials for providing the service.”[40]
The Seventh Circuit reached the same conclusion in Planned Parenthood of Indiana, Inc. v. Commissioner of the Indiana State Department of Health.[41] As to the third element — which the Ninth Circuit did not discuss at length because Arizona had not challenged that point — the Seventh Circuit held that the free-choice-of-provider requirement is couched in mandatory terms: “[T]he free-choice-of-provider statute explicitly refers to a specific class of people — Medicaid-eligible patients — and confers on them an individual entitlement — the right to receive reimbursable medical services from any qualified provider.”[42] Likewise, the Sixth Circuit in Harris v. Olszewski[43] held that the free-choice-of-provider requirement provides a private right of action enforceable under § 1983.
We agree with the Sixth, Seventh, and Ninth Circuits and hold that 42 U.S.C. § 1396a(a)(23) creates a private right of action that these Individual Plaintiffs can *460 enforce through 42 U.S.C. § 1983. LDHH’s remaining arguments fail to convince us otherwise.
LDHH and our dissenter rely on the Supreme Court’s decision in O’Bannon v. Town Court Nursing Center[44] for the proposition that the Individual Plaintiffs have no right to challenge LDHH’s provider-qualifications determination. That case is inapposite. There, the patient-plaintiffs’ injuries were alleged to stem from a deprivation of due process rights, specifically, the right to a hearing to contest the state’s decertification of a health care provider, not just its Medicaid qualification.[45] Specifically, the nursing home in question was found to not comply with statutes governing: (1) body and management, (2) medical direction, (3) physical services, (4) nursing services, (5) pharmaceutical services, (6) medical records, and (7) physical environment.[46] In contrast, the Individual Plaintiffs here assert the violation of a substantive right[47] The Supreme Court’s holding in O’Bannon that “while a patient has a right to continued benefits to pay for care in the qualified institution of his choice, he has no enforceable expectation of continued benefits to pay for care in an institution that has been determined to be unqualified,”[48] is thus not applicable here.
The statute speaks only in terms of recipients’ rights rather than providers’ rights, so the right guaranteed by § 1396a(a)(23) is vested in Medicaid recipients rather than providers. Providers like PPGC cannot bring a challenge pursuant to § 1396a(a)(23).[49] Reading O’Bannon to foreclose every recipient’s right to challenge a disqualification decision would render the right guaranteed by § 1396a(a)(23) nugatory.
Notably, the Court decided O’Bannon in the context of a state’s enforcement action. In that case, Pennsylvania had decertified Town Court Nursing Center (“Town Court”) because “it no longer met the statutory and regulatory standards for skilled nursing facilities.”[50] Three days later, Pennsylvania terminated the Medicaid provider agreement with Town Court.[51] The Supreme Court held:
When enforcement of [minimum standards of care] requires decertification of a facility, there may be an immediate, adverse impact on some residents. But surely that impact, which is an indirect *461 and incidental result of the Government’s enforcement action, does not amount to a deprivation of any interest in life, liberty, or property.[52]
In other words, the plaintiffs had no right to reside in an unqualified facility when the disqualification decision was connected to the state’s enforcement of its health and safety regulations.[53] This makes sense: If it were otherwise, patients could freely intervene in state enforcement actions against facilities that violate health and safety standards.
This case is different. Louisiana has never complained that PPGC is not competent to render the relevant medical services, and it has taken no independent action to limit or terminate PPGC’s entitlement to render medical services to the general population, for example, by revoking its license. Instead, Louisiana terminated only PPGC’s Medicaid provider agreement. The Individual Plaintiffs in this case are not challenging “the merits of the decertification decision,” as did the plaintiffs in O’Bannon, because here there was no de-certification decision. When, as here, a state terminates only a Medicaid provider agreement, independent of any action to enforce statutory and regulatory stan-
dards, O’Bannon is inapposite. The Individual Plaintiffs in this case are trying to sustain their “right to choose among a range of qualified providers, without government interference” — a right explicitly recognized in O’Bannon.[54]
LDHH’s reliance on the recent Supreme Court opinion, Armstrong v. Exceptional Child Center, Inc.,[55] is equally misplaced. There, the relevant issue was whether 42 U.S.C. § 1396a(a)(30)(A) — not § 1396a(a)(23) — creates a private right of action.[56] Writing for a plurality, Justice Scalia noted that this provision “lacks the sort of rights-creating language needed to imply a private right of action,” because it “is phrased as a directive to the federal agency ..., not as a conferral of the right to sue upon the beneficiaries of the State’s decision to participate in Medicaid.”[57] Justice Scalia also observed that § 1396a(a)(30)(A) was “judicially unadmin-istrable”: “It is difficult to imagine a requirement broader and less specific than § 30(A)’s mandate that state plans provide for payments that are ‘consistent with efficiency, economy, and quality of care,’ all the while ‘safeguardfing] against unnecessary utilization of ... care and ser *462 vices.’”[58] In contrast, § 1396a(a)(23) — the provision at issue here — is phrased in individual terms that are specific and judicially administrable, as recognized by the Sixth, Seventh, and Ninth Circuits.
LDHH finally insists that § 1396a(a)(23) provides Medicaid recipients with only the right to choose a qualified provider, not the right to choose a provider that LDHH has deemed unqualified. Understandably, LDHH does not take the next inferential step, but it follows that the free-choice-of-provider requirement gives individuals the right to demand care from a qualified provider when access to that provider is foreclosed by reasons unrelated to that provider’s qualifications. Otherwise, any right to which the Individual Plaintiffs are entitled to under § 1396a(a)(23) would be hollow.[59] Importantly, the Individual Plaintiffs insist that LDHH has deprived them of their choice to receive care from PPGC — a provider that LDHH has conceded is competent to render the relevant medical services — for reasons unrelated to its competence. The operative issue, therefore, is resolved by determining whether LDHH terminated PPGC’s Medicaid provider agreements based on its qualifications or based on some unrelated reason.
2. Likelihood of Success
Having concluded that § 1396a(a)(23) affords the Individual Plaintiffs a right of action, we next ask whether they are likely to substantially succeed on their claim that LDHH’s termination of PPGC’s Medicaid provider agreements violates their rights under § 1396a(a)(23).

a. Statutory Background

The free-choice-of-provider requirement mandates that a state’s Medicaid plan must allow beneficiaries to obtain medical care from any entity or person who is “qualified to perform the service or services required” and “who undertakes to provide him such services.”[60] Medicaid regulations allow states to set “reasonable standards relating to the qualifications of providers.”[61] The Medicaid statute does not define the term “qualified,” but LDHH concedes that, as held by the Seventh and Ninth Circuits, “[t]o be ‘qualified’ in the relevant sense is to be capable of performing the needed medical services in a professionally competent, safe, legal, and ethical manner.”[62] Separately, Medicaid’s exclusion provision, 42 U.S.C. § 1396a(p)(l), provides, “[i]n addition to any other authority,” mandatory and permissive grounds — including fraud, drug crimes, and failure to disclose necessary information to regulators — under which a state may terminate a provider’s Medicaid agreements. That provision’s implementing regulation states that “[njothing contained in this part should be construed to *463 limit a State’s own authority to exclude an individual or entity from Medicaid for any ' reason or period authorized by State law.”[63]
Against this backdrop, the Seventh Circuit, in Planned Parenthood of Indiana, Inc. v. Commissioner of Indiana State Department of Health, upheld a district court’s entry of a preliminary injunction that prevented Indiana from enforcing a law that “excludes a class of providers from Medicaid for reasons unrelated to provider qualifications” because Planned Parenthood was likely to succeed on its claim that the law violated 42 U.S.C. § 1396a(a)(23).[64] The law at issue prohibited state agencies from providing state or federal funds to “any entity that performs abortions or maintains or operates a facility where abortions are performed.”[65] The Seventh Circuit recognized that “[a]l-though Indiana has broad authority to exclude unqualified providers from its Medicaid program, the State does not have plenary authority to exclude a class of providers for any reason — more importantly, for a reason unrelated to provider qualifications.”[66] Because the law “exclude[d] Planned Parenthood from Medicaid for a reason unrelated to its fitness to provide medical services, [it] violated] its patients’ statutory right to obtain medical care from the qualified provider of their choice.”[67]
The Ninth Circuit addressed a similar law in Planned Parenthood Arizona Inc. v. Betlach.[68] That court held that the “law violates [the free-choice-of-provider] requirement by precluding Medicaid patients from using medical providers concededly qualified to perform family planning services to patients in Arizona generally, solely on the basis that those providers separately perform privately funded, legal abortions.”[69] In doing so, the Ninth Circuit rejected Arizona’s contention that it “can determine for any reason that a provider is not qualified for Medicaid purposes, even if the provider is otherwise legally qualified, through training and li-censure, to provide the requisite medical services within the state.”[70] That court gave four reasons, each of which we view as applicable here.
First, “[n]owhere in the Medicaid Act has Congress given a special definition to ‘qualified,’ much less indicated that each state is free to define this term for purposes of its own Medicaid program however it sees fit.”[71] Second, that reading would “detach[ ] the word ‘qualified’ from the phrase in which it is embedded; ‘qualified to perform the service or services rendered’ (and from the overall context of the Medicaid statute, which governs medical services).”[72] Third, that reading would render the free-choice-of-provider require *464 ment “self-eviscerating” because “[i]f states are free to set any qualifications they want — no matter how unrelated to the provider’s fitness to treat Medicaid patients — then the free-choice-of-provider requirement could be easily undermined by simply labeling any exclusionary rule as a ‘qualification.’ ”[73] “Giving the word ‘qualified’ such an expansive meaning would deprive the provision within which it appears of any legal force,” and “would permit states freely to erect barriers to Medicaid patients’ access to family planning medical providers others in the state are free to use.”[74] This “would eliminate ‘the broad access to medical care that § 1396a(a)(23) is meant to preserve.’ ”[75] Finally, “permit[ting] states self-referentially to impose for Medicaid purposes whatever standards for provider participation it wishes” would contravene the “mandatory requirements [in the free-choice-of-provider provision] that apply to all state Medicaid plans.”[76]
The Seventh and Ninth Circuits have also addressed the impact of Medicaid’s exclusion provision, 42 U.S.C. § 1396a(p). LDHH seems to rely on 42 U.S.C. § 1396a(p)(1)' for only its introductory phrase: “In addition to any other authority.” Like Arizona and Indiana, LDHH contends that this phrase allows a state to exclude a provider for “any” reason supplied by state law. The Seventh and Ninth Circuits flatly rejected that same contention.[77]
In doing so, the Seventh Circuit explained that this argument “reads the phrase for more than it’s worth.”[78] The phrase — “[i]n addition to any other authority” — “signals only that what follows is a non-exclusive list of specific grounds upon which states may bar providers from participating in Medicaid.”[79] “It does not imply that the states have an unlimited authority to exclude providers for any reason whatsoever.”[80]
The Ninth Circuit adopted the Seventh Circuit’s reasoning and further explained why this assertion “undermines, rather than aids, [the state’s] argument”:
The language refers to “any other authority” ..., followed by a provision providing states with authority to exclude providers on specified grounds. This sequence indicates that the Medicaid Act itself must provide that “other” authority, just as it supplies the “authority” covered by the rest of the subsection. Were it otherwise — were states free to exclude providers as they see fit — then the bulk of § 1396a(p)(l) itself would be unnecessary, as the “authority” it sup *465 plies would be superfluous.[81]
According to the Ninth Circuit, this “clause empowers states to exclude individual providers on such grounds directly, without waiting for the Secretary to act, while also reaffirming state authority to exclude individual providers pursuant to analogous state law provisions relating to fraud or misconduct.”[82] As to § 1396a(p)’s implementing regulation, 42 C.F.R. § 1002.2, which provides that “[njothing contained in this part should be construed to limit a State’s own authority to exclude an individual or entity from Medicaid for any reason or period authorized by State law,” the Ninth Circuit noted that “[t]hat provision is only a limitation on interpretation of the referenced ‘part’ of the regulations ... which does not encompass the free-choice-of-provider requirement.”[83]
While as a general rule a state may terminate a provider’s Medicaid agreements for reasons bearing on that provider’s general qualification to provide medical services, we are not aware of any case that holds a state may do so while continuing to license a provider’s authorization to offer those same services to non-Medicaid patients. “Qualified” means “to be capable of performing the needed medical services in a professionally competent, safe, legal, and ethical manner.”[84] States may also exclude providers on the grounds provided by 42 U.S.C. § 1396a(p)(l) and on analogous state law grounds relating to a provider’s qualification. Although states retain broad authority to define provider qualifications and to exclude providers on that basis, their authority is circumscribed by the meaning of “qualified” in this context.

b. Analysis

LDHH insists that its termination of PPGC’s Medicaid qualifications do not violate the Individual Plaintiffs’ free-choice-of-provider rights because LDHH has determined that PPGC is not “qualified” to render medical services to Medicaid patients. As noted, LDHH offers three grounds for its terminations: (1) two qui tarn FCA claims, one that PPGC settled, disclaiming all liability, and another that was pending at the time of LDHH’s termination action, but that has recently settled with PPGC disclaiming all liability; (2) unspecified misrepresentations in PPGC’s letters responding to LDHH’s inquiry into whether PPGC or PPCFC operate a fetal tissue donation program; and (3) LDHH’s and the Louisiana Office of Inspector General’s pending investigations into PPGC. But, none of these three grounds is directed at PPGC’s qualification to render medical services to Medicaid patients.
We agree with the district court that the Individual Plaintiffs are substantially likely to succeed in proving that LDHH’s termination of PPGC’s Medicaid provider agreements violates their free-choice-of-provider rights. This is because LDHH’s grounds for termination (1) do not relate to PPGC’s “qualifications,” (2) are not authorized by § 1396a(p), and (3), with one exception, are not even authorized by state law.
We observe initially that LDHH does not even attempt to articulate how its grounds for termination relate to PPGC’s qualifications. That failure is exacerbated by the fact that LDHH has separately *466 conceded that PPGC is competent to provide the relevant medical services. LDHH adopts the Seventh and Ninth Circuits definition of “qualified” and contends that its grounds for termination fall within the statute’s broad meaning of “qualified.” But LDHH makes no attempt to reconcile its grounds for termination with its borrowed definition of “qualified.” Its briefing is devoid of argument on this point, and LDHH’s grounds for termination do not speak for themselves. LDHH cannot show that PPGC’s settlement of qui tam FCA claims, in which it disclaimed all liability, constitutes actual fraud or renders PPGC unqualified in some other way. Neither does LDHH explain how unspecified misrepresentations related to a program, the existence of which PPGC unequivocally denies, render PPGC unqualified. Likewise, that PPGC is the subject of an investigation does not alone render PPGC unqualified. Importantly, LDHH raises no separate concerns regarding PPGC’s provision of medical services in Louisiana. Indeed, it bears repeating that LDHH has conceded that PPGC is competent to provide the relevant medical services to any and all non-Medicaid patients.
Instead of attempting to show that PPGC is not “qualified” under § 1396a(a)(23), LDHH seems to rely on its bald assertion that it may terminate a provider for any reason supplied by state law. In other words, LDHH argues that PPGC is unqualified simply because state law says so. The fallacy of this circular tactic is underscored by LDHH’s failure to articulate or apply any limiting principle to its authority to exclude any Medicaid provider. We reject that argument because, as explained by the Ninth Circuit, a state cannot “determine for any reason that a provider is not qualified for Medicaid purposes, even if the provider is otherwise legally qualified, through training and li-censure, to provide the requisite medical services within the state.”[85]
Neither does LDHH even assert that its grounds for termination are consistent or analogous with 42 U.S.C. § 1396a(p)(1)’s enumerated grounds for exclusion. LDHH might have attempted to make some argument as to this point, but it has not invoked any of the grounds for termination provided by § 1396a(p)(1). This is likely because, as the United States’s amicus curiae brief explains, LDHH’s grounds for termination are not authorized by any of the grounds enumerated in § 1396a(p)(1). And, to the extent LDHH relies on that provision’s “[i]n addition to any other authority” language, we join the Seventh and Ninth Circuits in rejecting such an over-broad interpretation.
Finally, two of LDHH’s grounds for termination — fraud and misrepresentations by PPGC — are not even supported by the state laws it invokes. LDHH labels its first ground for termination as “fraud,” citing two FCA suits filed against PPGC by qui tam plaintiffs. As to the first suit, LDHH asserts that it may exclude PPGC for (1) settling a qui tam FCA suit, and (2) failing to notify LDHH of the settlement. We have noted that, in Reynolds v. Planned Parenthood of Gulf Coast, Inc., PPGC settled a qui tam FCA suit while denying all liability. Louisiana Administrative Code Title 50 § 4147(A)(12) states that a Medicaid provider may be terminated for “entering into a settlement agreement under ... the Federal False Claims Act,” and further places an “affirmative duty” on a provider to inform LDHH in writing of any violations. But, that same statute states that “[i]f a False Claims Act action or other similar civil action is brought by a Qui-Tam plaintiff, no violation of this pro *467 vision has occurred until the defendant has been found liable in the action.”[86] Because PPGC settled the Reynolds qui tarn FCA claim without admitting liability, that settlement cannot provide the basis for applying the subject statute.
LDHH next cites another qui tarn FCA case against PPGC, Carroll v. Planned Parenthood Gulf Coast. At the time of the district court’s opinion and the parties’ briefing, that case was still pending and the trial court had denied PPGC’s motion to dismiss. LDHH argued that this lawsuit' creates a violation of Title 50 of the Louisiana Administrative Code because providers
“are required to ensure that all their agents and affiliates are in compliance with all federal and state laws as well as rules, policies and procedures of the Medicaid program. PPGC and its parent organization PPFA has failed to do so and has failed to notify DHH of violations and misconduct by affiliates and providers-in-fact.”
In so arguing, LDHH failed to demonstrate how the district court’s denial of a motion to dismiss in a pending lawsuit indicates that PPGC had violated any laws or Medicaid program requirements. More significantly, on May 25, 2016, PPGC filed a Rule 28(j) letter with this court, informing us that PPGC had settled that suit as of February 29, 2016, without admitting liability. Accordingly, the Carroll case provides no basis for termination.
LDHH’s asserted termination on the basis of “misrepresentations” suffers from similar flaws. Louisiana Revised Statute § 46:437.14(A)(1) states that a provider’s enrollment may be revoked for a “[misrepresentation.” [87] That statute separately defines “misrepresentation” to mean “the knowing failure to truthfully or fully disclose any and all information required, or the concealment of any and all information required on a claim or a provider agreement or the. making of a false or misleading statement to the department relative to the medical assistance programs.”[88]
LDHH posits that PPGC made misrepresentations in responding to questions about whether it operates a fetal tissue donation program, as evidenced by one of the discussed videos, which serves as LDHH’s sole basis for application of La. R.S. § 46:437.14(A)(1) and PPGC’s termination. Neither in the letters nor at any time during this litigation has LDHH identified a single misrepresentation. Moreover, the undisputed evidence establishes that PPGC does not perform any abortions or operate any fetal tissue donation pro *468 grams.[89] The district court found that the undisputed evidence revealed no indication that PPGC had made any misrepresentations, and LDHH does not even challenge that factual finding on appeal. LDHH’s only response is that its lack of specificity regarding the misrepresentations “should be addressed at an administrative hearing.” LDHH’s strategy to terminate PPGC’s provider agreements for misrepresentations before it can even identify a single misrepresentation does not pass muster.
Additionally, the statute cited by LDHH requires the misrepresentation to be made “relative to the medical assistance programs.” [90] Because the undisputed evidence establishes that PPGC does not provide abortions or operate a fetal tissue donation program in Louisiana (or elsewhere), any statements contained in PPGC’s response to the state’s inquiry are likely not “relative to” Louisiana’s Medicaid program. This conclusion is bolstered by LDHH’s August 4, 2015 letter that cites two statements made in relation to PPCFC, a separate Texas corporation, not to PPGC, as contradicting statements made in one of the videos.[91] LDHH provides no explanation of how the unspecified misrepresentations are “relative to” Louisiana’s Medicaid program.[92] For this reason alone, the statute is inapplicable.
As to LDHH’s final ground for termination — pending investigations — Louisiana Revised Statute § 46:437.11(D)(2) states that the “secretary may terminate a provider agreement immediately and without written notice if a health care provider is the subject of a sanction or of a criminal, civil, or departmental proceeding.” That provision appears to be facially applicable to PPGC as it is the subject of ongoing investigations. Regardless, we cannot reconcile the free-choice-of-provider requirement’s mandate with a state law that would enable LDHH to terminate a Medicaid provider agreement by simply instigating an investigation, much less on the basis of just any pending investigation. If states were able to exclude Medicaid providers on the basis of any investigation, § 1396a(a)(23)’s guarantee would be meaningless. And here, the investigations pertain to conduct that, as described, does not independently provide grounds for termination.
c. Limits of Our Opinion
In concluding that the Individual Plaintiffs are likely to succeed in proving that LDHH’s termination of PPGC’s provider agreements violates their § 1396a(a)(23) rights, we reiterate for emphasis the unique circumstances of the instant case. LDHH initially purported to terminate PPGC’s agreements “at will,” i.e., for no reason at all. That termination would plainly have run afoul of § 1396a(a)(23)’s guarantee. Despite LDHH’s categorization of its termination as “at will,” then-Governor Jindal released a contemporaneous statement indicating that the state was *469 terminating PPGC’s agreements “because Planned Parenthood does not represent the values of the State of Louisiana in regards to respecting human life.” Again, that termination would violate the Individual Plaintiffs’ § 1396a(a)(23) rights because, as the Seventh and Ninth Circuits have held, a state may not exclude a provider simply based on the scope of the services it provides.
Only after the Plaintiffs filed suit to challenge that termination did LDHH rescind its “at will” terminations and represent to the district court that it believed the Plaintiffs’ claims were moot. But, as noted above, LDHH’s gamesmanship was not over: The very next day, it issued new termination letters to PPGC, which provided new grounds for termination. LDHH has effectively run circles around PPGC and the district court. This course of conduct further convinces us that LDHH’s termination of PPGC’s Medicaid provider agreements has nothing to do with PPGC’s qualifications.
To be sure, the general grounds for termination invoked by LDHH — fraud, misrepresentations, and investigations— might well relate to a provider’s qualifications. States undoubtedly must be able to terminate provider agreements in cases of criminal activity, fraud and abuse, and other instances of malfeasance. Medicaid’s 42 U.S.C. § 1396a(p)(1)’s exclusionary provision makes that clear. And, there is no dispute that Louisiana retains authority to establish licensing standards and other qualifications for providers.[93] Title 42 U.S.C. § 1320a-7(b)(4) expressly contemplates that a state licensing authority may revoke a provider’s license “for reasons bearing on the individual’s or entity’s professional competence, professional performance, or financial integrity,” and that the Secretary may exclude such a provider from any federal health care program under that provision. Hence, 42 U.S.C. § 1396a(p)(1), which cross references § 1320a-7(b)(4), necessarily authorizes states to terminate a Medicaid provider’s agreements when that state revokes that provider’s license “for reasons bearing on the [provider’s] professional competence, professional performance, or financial integrity.” It bears repeating, however, that LDHH has taken no action to revoke PPGC’s license and has not called into question any qualification that enables PPGC to offer medical care generally.
At the most, LDHH has simply pasted the labels of “fraud” and “misrepresentations” on PPGC’s conduct, and then insisted that alone these content-less labels somehow insulate its termination actions from any § 1396a(a)(23) challenges. LDHH is seeking to do exactly what the Seventh and Ninth- Circuits warned against: “simply labeling any exclusionary rule as a ‘qualification’ ” to evade the mandate of the free-choice-of-provider requirement.[94] PPGC’s settlement of qui tam FCA claims without admitting liability does not constitute fraud under any definition of that term. And LDHH’s accusation that PPGC made misrepresentations related to inquiries into whether it operates a fetal tissue donation program is devoid of any factual support or linkage. Neither can LDHH’s labeling of its grounds for termination as fraud and misrepresentations insulate its actions from a § 1396a(a)(23) *470 challenge. If it were otherwise, states could terminate Medicaid providers with impunity and avoid § 1396a(a)(23)’s mandate altogether.
We repeat yet again for emphasis that LDHH has never once complained that PPGC is not competent to render the relevant medical services, and it has taken no independent action to limit or terminate PPGC’s entitlement to render medical services to the general population, for example, by revoking its license. As a result, LDHH’s termination of PPGC’s Medicaid provider agreements would produce precisely the anomalous result that the free-choiee-of-provider provision is meant to avoid, viz., LDHH would deny PPGC’s services only to Medicaid recipients while leaving all other individuals free to obtain the very same services from PPGC. But, “the free-ehoice-of-provider provision unambiguously requires that states participating in the Medicaid program allow covered patients to choose among the family planning medical practitioners they could use were they paying out of their own pockets.”[95]
In sum, we conclude that the Individual Plaintiffs are substantially likely to succeed in showing that LDHH’s termination of PPGC’s provider agreements violates their rights under § 1396a(a)(23). This is because LDHH seeks to terminate PPGC’s Medicaid provider agreements for reasons unrelated to its qualifications.
B. Remaining Factors
Finally, we turn to the other issues weighed by the district court: irreparable injury; harm to the enjoined party; public interest.
As to whether the Individual Plaintiffs will suffer irreparable injury in the absence of a preliminary injunction, LDHH first contends that because § 1396a(a)(23) guarantees the Individual Plaintiffs the right to choose only a qualified provider, they will suffer no harm because PPGC is not qualified. We have already rejected that obviously flawed circular argument.
LDHH next asserts that irreparable injury may not be presumed from a statutory violation, and the Individual Plaintiffs’ legal injury is not sufficiently concrete, great, and imminent to constitute irreparable harm. LDHH further contends that any inconvenience the Individual Plaintiffs sustain by being forced to seek medical care elsewhere is not significant enough to support a finding of irreparable harm.
The district court determined that the Individual Plaintiffs would suffer irreparable injury because they will not be able to obtain medical care from the Medicaid provider of their choice. The court relied on “uncontroverted” declarations, in which the Individual Plaintiffs state that they wish to continue receiving care at PPGC and that they do not know where else they could get the same kind and quality of care. The court further emphasized that even if the Individual Plaintiffs could find medical care elsewhere, this is beside the point: The Individual Plaintiffs would still be denied the provider of their choice, a right guaranteed under 42 U.S.C § 1396a(a)(23).
The Seventh Circuit squarely addressed this issue, rejecting an identical argument from the state:
Indiana maintains that any harm to [the] patients is superficial because they have many other qualified Medicaid providers to choose from in every part of the state. This argument misses the mark. That a range of qualified providers remains available is beside the point. Section 1396a(a)(23) gives Medicaid patients the *471 right to receive medical assistance from the provider of their choice without state interference, save on matters of qualifications.[96]
The Ninth Circuit has also stated that “[t]here is no exception to the free-choice-of-provider requirement for ‘incidental’ burdens on patient choice.”[97] Separately, that circuit has “several times held that beneficiaries of public assistance may demonstrate a risk of irreparable injury by showing that enforcement of a proposed rule may deny them needed medical care.”[98]
We are satisfied that the district court did not clearly err in holding that the Individual Plaintiffs will suffer irreparable harm, absent entry of a preliminary injunction, while this case plays out. Because the Individual Plaintiffs would otherwise be denied both access to a much needed medical provider and the legal right to the qualified provider of their choice, we agree that they would almost certainly suffer irreparable harm in the absence of a preliminary injunction.
LDHH next urges that its substantial interest in administering its Medicaid program — overseeing the expenditures of the state’s Medicaid funds and ensuring that Medicaid providers are complying with applicable laws and regulations — outweighs any injury to the Individual Plaintiffs, which it construes as “the mere inconvenience ... of having longer wait times or longer lead times for appointments for family planning services.” The district court rejected this rationale, holding that LDHH will not be deprived of its ability to administer Louisiana’s Medicaid program. Rather, the injunction relates only to LDHH’s attempt to terminate a single provider. The district court also held that any interest of the state is outweighed by the harm the Individual Plaintiffs will suffer.
The district court did not commit clear error in concluding that the harm to the Individual Plaintiffs will outweigh any harm inflicted on LDHH. As to its interest in administering the state’s Medicaid program, LDHH can never have a legitimate interest in administering that program in a manner that violates federal law.
As to LDHH’s fiscal interests, the Ninth Circuit addressed a balancing of similar interests in Independent Living Center of Southern California, Inc. v. Maxwell-Jolly.[99] It explained that because a “budget crisis does not excuse ongoing violations of federal law, particularly when there are no adequate remedies available other than an injunction,” “[s]tate budgetary considerations do not therefore, in social welfare cases, constitute a critical public interest that would be injured by the grant of preliminary relief.”[100] “In contrast, there is a robust public interest in safeguarding access to health care for those eligible for Medicaid, whom Congress has recognized as ‘the most needy in the country.’ ”[101] The Fourth Circuit has reached a similar conclusion: “Although we understand that the North Carolina legislature must make dif *472 ficult decisions in an imperfect fiscal climate, the public interest in this case lies with safeguarding public health rather than with assuaging North Carolina’s budgetary woes.”[102]
For these reasons, we hold that the district court did not commit clear error in ruling that the harm to the Individual Plaintiffs outweighs any harm that the state might experience.
Finally, LDHH challenges the district court’s determination that an injunction serves the public interest. It contends that the general public has an interest in the proper expenditure of the state’s Medicaid funds, including the oversight of providers who are receiving those funds. The district court determined that the injunction serves the public interest by ensuring that Medicaid recipients have continuing access to medical care at PPGC.
Because LDHH’s termination of PPGC’s Medicaid provider agreements likely violates federal law, there is no legitimate public interest in allowing LDHH to complete its planned terminations of those agreements under these immediate facts. Instead, the public interest weighs in favor of preliminarily enforcing the Individual Plaintiffs’ rights and thereby allowing some of the state’s neediest citizens to continue receiving medical care from a medically qualified provider. We emphasize that “there is a legitimate public interest in safeguarding access to health care for those eligible for Medicaid.”[103] The district court did not err in ruling that preliminarily enjoining LDHH’s terminations will serve the public interest.
C. The Dissent
We close where we began. Despite the obvious scholarship of its able author, the dissent cannot avoid the determinative distinction between this case and O’Ban-non. There, because the state decertified the medical provider totally for failure to meet statutory and regulatory requirements for certification as a skilled nursing facility, the Supreme Court held that none of its former clientele — implicitly, whether covered by Medicaid or commercial insurance — had standing to advance constitutional claims because they were only affected incidentally. Here, Lotdsiana did not decertify PPGC or reference failure to meet any statutory or regulatory requirements. It only prevented it from providing Medicaid funded treatment to the impoverished women of the State: The financially independent women of the State (or at least those covered by commercial health plans or their own bank accounts) can continue to be fully served by PPGC. Although, the opinion in O’Bannon does not expressly state whether the state’s decer-tification of the facility caused it to go out of business entirely, we are satisfied that decertification had a crippling effect on the institution even if it did not cause it to shut down totally. Not so in this case. In sum, the institution in O’Bannon was de-certified for reasons having to do with the quality of care provided to patients. Here, the state has not impugned the quality of PPGC’s care, and it will continue in business: Only its Medicaid patients will be prevented from receiving treatment there. Although this fact alone does not automatically confer a private right of action, the dissent cannot avoid this distinction, which makes O’Bannon fully inapplicable.
CONCLUSION
We hold that the Individual Plaintiffs met their burden of proving their entitle *473 ment to a preliminary injunction. We also hold that the district court did not abuse its discretion in preliminarily enjoining LDHH’s termination of PPGC’s Medicaid provider agreements. In so doing, we have addressed only the facts and issues necessary to address the district court’s preliminary injunction. Our determinations do not bind any future summary judgment or merits panels.[104] The district court’s preliminary injunction is AFFIRMED and this case is REMANDED for further proceedings consistent herewith.

. The Take Charge Plus program provides family planning services to eligible women and men with incomes at or below 138 percent of the federal poverty level.

. As PPGC's letter indicates, PPCFC was operated as a division of PPGC until 2005, at which point it was separately incorporated in Texas. PPCFC also has a Certificate of Authority to Transact Business in Louisiana.

. The district court asked LDHH’s counsel several questions pertaining to this issue:
THE COURT: All right. So the reason [for LDHH’s termination action] is unrelated to the ability of these two facilities to provide adequate care to their patients; is that true?
MR. RUSSO: That I would agree with, yes, sir.
THE COURT: So Ms. Kliebert’s position is that these are terminated without a relationship of any kind to the adequacy of care; correct?
MR. RUSSO: Correct, at this time, your honor, exactly.

. No. 9:09-cv-124-RC (E.D. Tex.).

. No. 4:12-cv-03505 (S.D. Tex.).

. U.S. Const, art. III, § 2, cl. 1.

. Therefore, we decline to address LDHH’s arguments related to the justiciability of PPGC’s claims.

. League of United Latin Am. Citizens, Dist. 19 v. City of Boerne, 659 F.3d 421, 428 (5th Cir. 2011).

. Lujan v. Defs. of Wildlife, 504 U.S. 555, 560-61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (internal quotation marks and citations omitted).

. Susan B. Anthony List v. Driehaus, — U.S.-, 134 S.Ct. 2334, 2341, 189 L.Ed.2d 246 (2014) (internal quotation marks omitted) (quoting Clapper v. Amnesty Int’l USA, 568 U.S. 398, 133 S.Ct. 1138, 1147, 1150, n.5, 185 L.Ed.2d 264 (2013)).

. See Comsat Corp. v. FCC, 250 F.3d 931, 936 (5th Cir. 2001) ("A threatened injury satisfies the injury in fact requirement so long as that threat is real rather than speculative.”); Loa-Herrera v. Trominski, 231 F.3d 984, 988 (5th Cir. 2000) ("Mere threatened injury is sufficient, and the threat in this case is real.”).

. Clapper, 133 S.Ct. at 1147-48 (2013) (internal quotation marks omitted) (quoting Whitmore v. Ark., 495 U.S. 149, 158, 110 S.Ct. 1717, 109 L.Ed.2d 135 (1990)).

. LDHH concedes separately that "exhaustion is often not a barrier to a claim based on 42 U.S.C. § 1983."

. Worth v. Seldin, 422 U.S. 490, 514, 95 . S.Ct. 2197, 45 L.Ed.2d 343 (1975); see also Spokeo v. Robins, - U.S. -, 136 S.Ct. 1540, 1549, 194 L.Ed.2d 635 (2016) ("Congress’ role in identifying and elevating intangible harms does not mean that a plaintiff automatically satisfies the injury-in-fact requirement whenever a statute grants a person a statutory right and purports to authorize that person to sue to vindicate that right.”).

. Bennett v. Spear, 520 U.S. 154, 168-69, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997).

. Id. at 169, 117 S.Ct. 1154 (internal citations omitted) (emphasis in original).

. See City of Boerne, 659 F.3d at 431 ("The causation element does not require a party to establish proximate causation, but only requires that the injury be 'fairly traceable’ to the defendant.” (citing Bennett, 520 U.S. at 168-69, 117 S.Ct. 1154)).

. Venator Grp. Specialty, Inc. v. Matthew/Muniot Family, LLC, 322 F.3d 835, 838 (5th Cir. 2003).

. Texas v. United States, 497 F.3d 491, 498 (5th Cir. 2007) (citing Abbott Labs. v. Gardner, 387 U.S. 136, 149, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967)).

. New Orleans Pub. Serv., Inc. v. Council of the City of New Orleans, 833 F.2d 583, 587 (5th Cir. 1987).

. (emphasis added).

. Pearson v. Holder, 624 F.3d 682, 684 (5th Cir. 2010) (quoting Chevron U.S.A., Inc. v. Traillour Oil Co., 987 F.2d 1138, 1153 (5th Cir. 1993)).

. Google, Inc. v. Hood, 822 F.3d 212, 220 (5th Cir. 2016) (quoting Lake Charles Diesel, Inc. v. Gen. Motors Corp., 328 F.3d 192, 195— 96-(5th Cir. 2003)).

. Id. (citing Bluefield Water Ass'n v. City of Starkville, 577 F.3d 250, 253 (5th Cir. 2009)).

. Atkins v. Rivera, 477 U.S. 154, 156-57, 106 S.Ct. 2456, 91 L.Ed.2d 131 (1986) ("The Federal Government shares the costs of Medicaid with States that elect to participate in the program.”).

. Id. at 157, 106 S.Ct. 2456 (citing 42 U.S.C. § 1396a; Schweiker v. Gray Panthers, 453 U.S. 34, 36-37, 101 S.Ct. 2633, 69 L.Ed.2d 460 (1981)).

. Nat’l Fed’n of Indep. Bus. v. Sebelius, 567 U.S. 519, 132 S.Ct. 2566, 2581, 183 L.Ed.2d 450 (2012).

. Armstrong v. Exceptional Child Ctr., Inc., - U.S. -, 135 S.Ct. 1378, 1382, 191 L.Ed.2d 471 (2015) (Scalia, J.) (plurality opinion).

. 42 U.S.C. § 1396a(a)(23)(A).

. 447 U.S. 773, 785, 100 S.Ct. 2467, 65 L.Ed.2d 506 (1980) (emphasis in original).

. Planned Parenthood of Ariz. Inc. v. Betlach, 727 F.3d 960, 967 (9th Cir. 2013) (second alteration in original) (quoting 42 U.S.C. § 1396a(a)(23)(A)).

. S.D. ex rel. Dickson v. Hood, 391 F.3d 581, 602 (5th Cir. 2004) (quoting Blessing v. Freestone, 520 U.S. 329, 340, 117 S.Ct. 1353, 137 L.Ed.2d 569 (1997) (emphasis in original)).

. Id.

. See Planned Parenthood of Ariz., 727 F.3d 960; Planned Parenthood of Ind., Inc. v. Comm'r of Ind. State Dep't of Health, 699 F.3d 962 (7th Cir. 2012); Harris v. Olszewski, 442 F.3d 456 (6th Cir. 2006); Planned Parenthood of Kan. & Mid-Mo. v. Mosier, No. 16-2284-JAR-GLR, 2016 WL 3597457 (D. Kan. July 5, 2016); Planned Parenthood Se., Inc. v. Bentley, 141 F.Supp.3d 1207 (M.D. Ala. 2015); Planned Parenthood Ark. & E. Okla. v. Selig, *459 No. 4:15-cv-566, slip op. (E.D. Ark. Oct. 2, 2015); Women’s Hosp. Found. v. Townsend, No. 07-711, 2008 WL 2743284 (M.D. La. July 10, 2008).

. 727 F.3d at 966 (quoting 42 U.S.C. § 1396a(a)(23)(A)).

. Id. at 967 (quoting Watson v. Weeks, 436 F.3d 1152, 1161 (9th Cir. 2006)).

. Id.

. Id. (alteration in original) (quoting 42 U.S.C. § 1396a(a)(23)(A)).

. Id.

. Id. at 967-68.

. 699 F.3d 962 (2012).

. Id. at 974.

. 442 F.3d 456 (2006).

. 447 U.S. 773, 100 S.Ct. 2467, 65 L.Ed.2d 506 (1980).

. Id. at 776 n.3, 100 S.Ct. 2467.

. Id.

. See Planned Parenthood of Ind., 699 F.3d at 977 (distinguishing O’Bannon on the same basis). LDHH also relies on Kelly Rare, Ltd. v. O’Rourke, 930 F.2d 170 (2d Cir. 1991), but that case is distinguishable for the same reason as O’Bannon. See Planned Parenthood of Ind., 699 F.3d at 977 (distinguishing Kelly Rare on the same basis).

. 447 U.S. at 786, 100 S.Ct. 2467.

. See § 1396a(a)(23) (requiring state plans provide that "any individual eligible for medical assistance ... may obtain such assistance from any institution, agency, community pharmacy, or person, qualified to perform the service or services required ... who undertakes to provide him such services”); cf. Wilder v. Va. Hosp. Ass’n, 496 U.S. 498, 110 S.Ct. 2510, 110 L.Ed.2d 455 (1990) (finding that provision requiring states to reimburse providers at reasonable and adequate rates gave providers an enforceable right under the Medicaid law). Providers might have an administrative remedy in state court — as PPGC did in this case — but "[t]he availability of state administrative procedures ordinarily does not foreclose resort to § 1983.” Id. at 523, 110 S.Ct. 2510.

. O’Bannon, 447 U.S. at 775-76, 100 S.Ct. 2467.

. Id. at 776, 100 S.Ct. 2467.

. Id. at 787, 100 S.Ct. 2467 (emphasis added); see also id. at 790, 100 S.Ct. 2467 (concluding that "the enforcement by [Pennsylvania] of [its] valid regulations did not directly affect the patients’ legal rights or deprive them of any constitutionally protected interest in life, liberty, or property”).

. See Kelly Rare, 930 F.2d at 178 ("In O’Bannon, the Supreme Court held that Medicaid-eligible nursing home patients did not have a vested right to choose a nursing home that was being decertified as a health-care provider." (emphasis added)).

. 447 U.S. at 785, 100 S.Ct. 2467 (emphasis in original).

. -U.S.-, 135 S.Ct. 1378, 191 L.Ed.2d 471 (2015).

. That provision of the Medicaid statute requires state plans to "provide such methods and procedures relating to the utilization of, and the payment for, care and services available under the plan ... as may be necessary to safeguard against unnecessaiy utilization of such care and services and to assure that payments are consistent with efficiency, economy, and quality of care and are sufficient to enlist enough providers so that care and services are available under the plan at least to the extent that such care and services are available to the general population in the geographic area[.]” 42 U.S.C. § 1396a(a)(30)(A).

. Armstrong, 135 S.Ct. at 1387.

. Id. at 1385 (alteration and omission in original).

. See Planned Parenthood Se., 141 F.Supp.3d at 1218 (“If [it] were correct that allegedly unlawful terminations of provider agreements could not be challenged by recipients pursuant to the free-choice-of-provider provision, that provision’s 'individual entitlement,’ the 'personal right’ it gives recipients, would be an empty one.” (quoting Planned Parenthood of Ind., 699 F.3d at 974)).

. 42 U.S.C. § 1396a(a)(23)(A).

. 42 C.F.R. § 431.51(c)(2).

. Planned Parenthood of Ind., 699 F.3d at 978; see also Planned Parenthood of Ariz., Til F.3d at 969 ("We agree with the Seventh Circuit that '[r]ead in context, the term qualified’ as used in § 1396a(a)(23) unambiguously relates to a provider’s ... capab[ility] of performing the needed medical services in a professionally competent, safe, legal, and ethical manner.' ” (alterations and omissions in original) (quoting Planned Parenthood of Ind., 699 F.3d at 978)).

. 42 C.F.R. § 1002.2.

. Planned Parenthood of Ind., 699 F.3d at 980.

. Id. at 967 (quoting Ind. Code § 5-22-17-5.5(b)).

. Id. at 968.

. Id.

. The law at issue provided: “[Arizona] or any political subdivision of [Arizona] may not enter into a contract with or make a grant to any person that performs nonfederally qualified abortions or maintains or operates a facility where nonfederally qualified abortions are performed for the provision of family planning services.” 2012 Ariz. Leg. Serv. Ch. 288 (H.B. 2800) (West) (codified at Ariz. Rev. Stat. § 35-196.05(B)).

. Planned Parenthood Ariz., 727 F.3d at 963.

. Id. at 970 (emphasis in original).

. Id.

. Id. (emphasis in original).

. Id. (quoting Planned Parenthood of Ind., 699 F.3d at 978).

. Id.

. Id. (quoting Planned Parenthood of Ind., 699 F.3d at 978).

. Id. at 971 (emphasis in original).

. The First Circuit in First Medical Health Plan, Inc. v. Vega-Ramos, 479 F.3d 46 (1st Cir. 2007), however, read 42 U.S.C. § 1396a(p)(1)’s "[i]n addition to any other authority” language much more broadly. That court held that the " 'any other authority’ language was intended to permit a state to exclude an entity from its Medicaid program for any reason established by state law.” Id. at 53. That case is distinguishable because it did not involve § 1396a(a)(23)’s free-choice-of-provider requirement, most notably because § 1396a(a)(23) does not apply in Puerto Rico, the forum from which the dispute arose in Vega-Ramos.

. Planned Parenthood of Ind., 699 F.3d at 979.

. Id.

. Id.

. Planned Parenthood of Ariz., 727 F.3d at 972.

. Id.

. Id. at 972 n.8; accord Planned Parenthood of Se., 141 F.Supp.3d at 1221.

. Planned Parenthood of Ind., 699 F.3d at 978.

. Planned Parenthood of Ariz., 727 F.3d at 970 (emphasis in original).

. La. Admin Code tit. 50 § 4147(A)(12)(c).

. This provision is part of Louisiana’s Medical Assistance Programs Integrity Law, La. R.S. § 437.1 et seq., which was “enacted to combat and prevent fraud and abuse committed by some health care providers participating in the medical assistance programs and by other persons and to negate the adverse effects such activities have on fiscal and programmatic integrity.” La. R.S. § 437.2(A). More specifically, the Louisiana legislature sought to provide a remedy against "health care providers and other persons who engage in fraud, misrepresentation, abuse, or other ill practices ... to obtain payments to which these health care providers or persons are not entitled.” La. R.S. § 437.2(B) (emphasis added).

. La. R.S. § 46:437.3(15) (emphasis added); see also Caldwell v. Janssen Pharm., Inc., 144 So.3d 898, 911 (La. 2014) ("[W]e determine that a ‘misrepresentation’ under La. Rev. Stat. 46:437.3(15) is (1) the knowing failure to truthfully or full disclose any information required on a claim or provider agreement; (2) the concealment of any and all information required on a claim or provider agreement; or (3) the making of a false or misleading statement to the department relative to the medical assistance programs.”).

. PPGC’s August 14, 2015 letter states: "To be very clear, there is no contradiction here. As already stated, neither PPCFC nor PPGC currently has a fetal tissue donation program in Texas, and neither sells nor donates any fetal tissue.”

. La. R.S. § 46:437.3(15).

. In the August 4, 2015, letter, LDHH recites two responses PPGC made in relation to only PPCFC's operations. It then states that those responses were contradicted by one of the Center for Medical Progress's videos made on April 9, 2015.

.Had LDHH come forward with evidence of PPGC’s misrepresentations, it is possible LDHH would have had a valid reason for terminating PPGC as a Medicaid provider.

. See Planned Parenthood of Ind., 699 F.3d at 980 ("No one disputes that the states retain considerable authority to establish licensing standards and other related practice qualifications for providers — this residual power is inherent in the cooperative-federalism model of the Medicaid program and expressly recognized in the Medicaid regulations.”).

. Id. at 978; Planned Parenthood of Ariz., 727 F.3d at 970.

. Planned Parenthood of Ariz., 727 F.3d at 971.

. Planned Parenthood of Ind., 699 F.3d at 981.

. Planned Parenthood of Ariz., 727 F.3d at 975.

. M.R. v. Dreyfus, 697 F.3d 706, 732 (9th Cir. 2011) (internal quotation marks omitted).

. 572 F.3d 644 (9th Cir. 2009), vacated and remanded on other grounds, 565 U.S. 606, 132 S.Ct. 1204, 182 L.Ed.2d 101 (2012).

. Id. at 659.

. Id. (quoting Schweiker v. Hogan, 457 U.S. 569, 590, 102 S.Ct. 2597, 73 L.Ed.2d 227 (1982) (quoting H.R. Rep. No. 89-213, at 66 (1965))).

. Pashby v. Delia, 709 F.3d 307, 331 (4th Cir. 2013).

. Maxwell-Jolly, 572 F.3d at 659.

. See Planned Parenthood of Greater Tex. Surgical Health Servs. v. Abbott, 734 F.3d 406, 419 (5th Cir. 2013).