# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**
January 17, 2019

Lyle W. Cayce
Clerk

No. 17-50282

PLANNED PARENTHOOD OF GREATER TEXAS FAMILY PLANNING AND PREVENTATIVE HEALTH SERVICES, INC; PLANNED PARENTHOOD SAN ANTONIO; PLANNED PARENTHOOD CAMERON COUNTY; PLANNED PARENTHOOD GULF COAST, INC; PLANNED PARENTHOOD SOUTH TEXAS SURGICAL CENTER; JANE DOE #1; JANE DOE #2; JANE DOE #4; JANE DOE #7; JANE DOE #9; JANE DOE #10; JANE DOE #11,

     Plaintiffs - Appellees

v.

CHARLES SMITH, in his official capacity as Executive Commissioner of HHSC; SYLVIA HERNANDEZ KAUFFMAN, in her official capacity as Acting Inspector General of HHSC,

     Defendants - Appellants

Appeal from the United States District Court
for the Western District of Texas

Before JOLLY, JONES, and HAYNES[1], Circuit Judges.

EDITH H. JONES, Circuit Judge:

The Texas Health and Human Services Commission's Office of Inspector General ("OIG") sought to terminate the Medicaid provider agreements of Planned Parenthood affiliates throughout the state. The agency based this

---

[1] Judge Haynes concurs in the judgment only.

No. 17-50282

decision largely on undercover video footage of graphic discussions with Planned Parenthood personnel concerning the prospective sale of liver, thymus, and neural tissue from fetuses aborted during the second trimester of pregnancy.    The videos justified terminating the affiliates' provider agreements, the agency contended, because they indicated noncompliance with accepted medical and ethical standards.  Three Planned Parenthood affiliates ("Provider Plaintiffs") and several Medicaid beneficiaries ("Individual Plaintiffs") sought a preliminary injunction against the termination decision. The district court held that the Individual Plaintiffs possessed a private right of action under the "qualified-provider" provision of the Medicaid Act, 42 U.S.C. § 1396a(a)(23), and issued a preliminary injunction preventing Texas from terminating Medicaid funding to the Planned Parenthood facilities statewide.  The state agency has appealed.

We are constrained to affirm the district court's conclusion that the plaintiffs possess a private right of action, as held by this court in *Planned Parenthood Gulf Coast v. Gee*, 862 F.3d 445 (5th Cir. 2017) (hereafter, "*Gee*") (*cert denied*, 139 S. Ct. 408).  But Judge Jones, in a separate concurrence,  urges rehearing en banc on that issue, which has divided the appellate courts.  We vacate the preliminary injunction and remand for the district court to limit its review to the agency record under an arbitrary-and-capricious standard.

## I.  BACKGROUND

### A.  Planned Parenthood Affiliates

The Provider Plaintiffs operate health centers and provide family planning services to about 12,500 Medicaid patients and the general public. Planned Parenthood Gulf Coast ("PPGC") runs seven health centers in the Houston area.  Planned Parenthood Greater Texas ("PPGT") and Planned

Parenthood South Texas ("PPST")[2] operate an additional 23 health centers.  As affiliates of Planned Parenthood Federation of America ("PPFA"),  they must adhere to various organizational standards  to use the Planned Parenthood name and trademark.

Among the Provider Plaintiffs, only PPGC has sold fetal tissue for use in outside research.[3]  Melissa Farrell has served as PPGC's Research Director since 2006.  In this role, she provides information about PPGC's services to outside researchers, develops budgets and contracts, and facilitates Institutional Review Board ("IRB") submissions.  Ms. Farrell has been involved in several outside studies involving fetal tissue research.  In 2006, PPGC participated in a first-trimester fetal tissue study.  A second study, conducted in conjunction with the University of Texas Medical Branch in Galveston ("UTMB"), ran from 2010 to 2011 and concerned first-trimester placental tissue.

To facilitate these studies, Ms. Farrell stated that she would modify certain clinical procedures and require consent from the abortion patients whose procedures yielded fetal tissue.  Both studies required that fetal tissue be processed and packaged following the abortions.  The UTMB study additionally required PPGC to use a sterile process to collect the placental

---

[2] PPST is technically an umbrella organization comprising three other named plaintiffs: Planned Parenthood Cameron County, Planned Parenthood San Antonio, and Planned Parenthood South Texas Surgical Center.

[3] PPGC itself does not technically provide abortions. But an affiliated entity—located in the same building as PPGC's headquarters and called Planned Parenthood Center For Choice ("PPCFC")—does provide abortions.  PPGC's own research department handles all of PPCFC's research agreements because PPCFC has no separate research department or personnel of its own.  The district court pretermitted the question whether PPGC and PPCFC were effectively a single organization.

No. 17-50282

tissue after the abortion. Dr. Regan Theiler, a researcher involved in the UTMB project, also performed abortions at PPGC's facility.

Ms. Farrell communicated with Baylor College of Medicine regarding another fetal tissue donation project from 2013 through 2015. They discussed IRB approval, next steps, and draft contract terms, but no contract or budget was finalized.

## B.  Undercover Videos and Ensuing Investigations

In 2015, the Center for Medical Progress ("CMP"), a pro-life organization, released more than eight hours of undercover videos disclosing conversations held at the PPGC headquarters. In the CMP videos, two individuals posed as representatives from a fetal tissue procurement company. They claimed to be interested in purchasing liver, thymus, and neural tissue from fetuses aborted during the second trimester of pregnancy. Ms. Farrell features prominently in the video, as she discusses the possibility of a research partnership, provides a tour of PPGC's surgical facilities, and displays tissue samples from recently aborted fetuses.



Dr. Tram Nguyen, the director of PPGC's abortion facility, confirmed many of Ms. Farrell's statements.

4

No. 17-50282

The release of these graphic videos prompted federal and state investigations into numerous Planned Parenthood affiliates. The Harris County District Attorney, the Texas Rangers, and the Houston Police Department investigated but brought no charges. Likewise, the Texas Attorney General's Office, the Texas Department of State Health Services, and the Texas Health and Human Services Commission conducted investigations.

Additionally, the U.S. House of Representatives formed a Select Investigative Panel ("Select Panel") to investigate abortion providers' medical practices involving fetal tissue procurement. Representative Marsha Blackburn of Tennessee, a Republican, was named Chair of the bipartisan Select Panel. In December 2016, Blackburn emailed the Texas Attorney General Ken Paxton evidence the Select Panel had gathered about PPGC and asked Texas to investigate possible violations of Tex. Penal Code § 48.02, which prohibits the purchase and sale of human organs, and Tex. Penal Code § 37.08, which prohibits making a false report to a law enforcement officer.

## C. Termination of Medicaid Provider Agreements

As participants in the Texas Medicaid program,[4] the Provider Plaintiffs and each of their related health centers signed Medicaid provider agreements and agreed to comply with all Texas Medicaid policies and applicable state and federal regulations. The Provider Plaintiffs received $3.4 million from Texas Medicaid funds.[5] Texas Health and Human Services Commission Office of Inspector General ("OIG" or "the agency") oversees compliance with state

---

[4] Texas Medicaid only pays for abortions under narrow circumstances—specifically, when a woman's life is in danger or for victims of rape and incest.

[5] This amount is a smidgen of the three affiliates' combined revenues of approximately $57 million in 2013.

5

No. 17-50282

Medicaid policies and may conduct investigations and terminate Medicaid provider agreements for noncompliance.

OIG may terminate a Medicaid provider agreement when "prima facie evidence" establishes that a provider has committed a "program violation" or is "affiliated with a person who commits a program violation." 1 Tex. Admin. Code § 371.1703(c), (c)(6)-(8). A "program violation" includes any violation of federal law, state law, or the Texas Medicaid program policies. For instance, as explained in the Texas Medicaid Provider Procedures Manual, a provider violates Texas Medicaid rules if it fails to offer health services in accordance with "accepted medical community standards." *See* 1 Tex. Admin. Code § 371.1659(2).

In October 2015, OIG sent each Provider Plaintiff a Notice of Termination, stating that each was "no longer capable of performing medical services in a professionally competent, safe, and legal manner." The Notice listed the bases for termination and stated that, unless the Provider Plaintiffs responded within 30 days, a Final Notice of Termination would issue.

Instead of responding to the Notice and pursuing administrative and state judicial avenues of relief, the Provider Plaintiffs sued in federal court to block the termination. The Individual Plaintiffs—Texas Medicaid beneficiaries who have received services from the Provider Plaintiffs—joined in this challenge. On the state agency's motion, the district court stayed the proceedings for almost a year pending a Final Notice of Termination. OIG sent the Final Notice on December 20, 2016.

The Final Notice states that the Inspector General had determined that the Provider Plaintiffs were "not qualified to provide medical services in a professionally competent, safe, legal and ethical manner under the relevant provisions of state and federal law pertaining to Medicaid providers." The

6

Final Notice bases this conclusion on the CMP videos and evidence provided by the Select Panel. The Final Notice states that the Inspector General consulted with the Chief Medical Officer, who reviewed the evidence and concluded that PPGC had violated "generally accepted medical standards, and thus [was] not qualified to provide medical services."

The Final Notice then specifies the "numerous violations of generally accepted standards of medical practice" established by the CMP video, including "a history of deviating from accepted standards to procure samples that meet researcher[s'] needs" and "a history of permitting staff physicians to alter procedures to obtain targeted tissue samples needed for their specific outside research." The Final Notice also states that evidence establishes that PPGC engaged in misrepresentations regarding fetal tissue procurement. The Final Notice concludes that under OIG's regulations, affiliates of a terminated entity are also subject to termination. *See* 1 Tex. Admin. Code § 371.1703(c)(7).

## D. Court Proceedings

After reviewing the Final Notice, the plaintiffs filed an amended complaint and a new motion for a preliminary injunction. The district court conducted a three-day evidentiary hearing, during which it reviewed the CMP videos and heard testimony from medical and ethics experts on both sides. The plaintiffs offered testimony of the Provider Plaintiffs' CEOs, Ms. Farrell, and PPGC's Medical Director. The agency offered testimony of the Inspector General, OIG's Chief Medical Officer, an expert in obstetrics and gynecology, and a bioethics expert.

Much of the evidentiary hearing consisted of review and analysis of clips from the CMP videos. The agency focused on evidence that PPGC had violated federal regulations relating to fetal tissue research by altering abortion procedures for research purposes or allowing the researchers themselves to be

involved in performing abortions to harvest their preferred tissue samples. *See* 42 U.S.C. § 289g-1(c)(4) (requiring researchers to certify that they "had no part in any decisions as to the timing, method, or procedures used to terminate the pregnancy made solely for the purposes of the research"); 45 C.F.R. § 46.204(i) (for research involving pregnant women or fetuses, requiring that "[i]ndividuals engaged in the research will have no part in any decisions as to the timing, method, or procedures used to terminate a pregnancy"); 42 U.S.C. § 289g-1(b)(2)(A)(ii) (requiring researchers to certify that "no alteration of the timing, method, or procedures used to terminate the pregnancy was made solely for the purposes of obtaining the tissue"). The plain purposes of the regulations are to prevent conflicts of interest between the researcher and patients and to eliminate any temptation to place research studies above the patients' medical needs. In addition to federal regulations, state regulations authorize sanctions for providers who fail to adhere to "accepted medical community standards." *See* 1 Tex. Admin. Code § 371.1659(2).

Various of Ms. Farrell's statements were offered as evidence that PPGC had violated or is willing to violate these standards. For example, at one point in the video, Ms. Farrell responds to questions about whether PPGC has "physicians who would be able to change the procedure a bit" for research purposes, and Ms. Farrell says, "Yep." She then adds:

> Yes. And it will depend. Obviously the change in the procedure will have to be where it's not going to put the patient at more risk . . . prolong the procedure putting her at more risk, and altering the procedure where we leave content in the patient, which obviously we're trying to get . . . and that's something we'll have to discuss, you know, with the docs . . . and see how they can do it. Because some of our[] doctors in the past have projects, and they're collecting the specimens so they do it in a way that they get the best specimen. So I know it can happen.

Later in the video, Ms. Farrell identifies Dr. Theiler, a participant in the UTMB study, as someone who would be a good reference.  She explains:

> Yeah. So she knows what's involved in modifying what we need to do to get you the specimens that are intact because she's done it. . . . And she was doing those here.

Dr. Nguyen confirmed that the PPGC abortion facility can obtain intact liver and thymus.  The doctor stated, sarcastically, that while federal law (prohibiting partial birth abortions) restricts a facility from intentionally retrieving an intact fetus, PPGC can make it happen by signing a form that they did not so "intend."  Nguyen also stated that obtaining intact specimens of liver, thymus, and neural tissue depends upon the amount of cervical dilation of the patient and the patient's pain tolerance.  The doctor noted risks associated with fetal tissue procurement that PPGC is willing to take because "it is for a good cause."  The doctor acknowledged that two particular PPGC doctors can alter the abortion procedure to meet a researcher's request. Relying on these statements, others like them, and their expert testimony, OIG sought to justify its termination decision.

The plaintiffs' live witnesses, on the other hand, denied that PPGC ever altered abortion procedures for research purposes. Ms. Farrell herself testified that, in the videos, she was actually discussing changes to clinical operations and not changes to the abortion procedures themselves.

Following the hearing, the district court issued a memorandum and order granting the plaintiffs' motion for a preliminary injunction.  The district court held that the Individual Plaintiffs possessed a private right of action to challenge OIG's termination decision.  Analyzing OIG's evidence of PPGC's program violations, the district court credited the plaintiffs' self-justifying explanations.  The court found that even in the light most favorable to the agency, the videotaped discussions were ambiguous and open to interpretation.

No. 17-50282

The district court stated, inaccurately, that the CMP video had not been authenticated and suggested that it may have been edited.[6] The district court also noted that neither the Inspector General nor the Medical director had expert knowledge concerning abortion procedures. And the court discounted Ms. Farrell's videotaped statements because she claimed on the witness stand that she really had no personal knowledge of the medical aspects of abortion procedures and had never even been in the room when an abortion was performed.

While the court felt free to credit all of the trial testimony from the Provider Plaintiffs—none of which had been offered during the state administrative procedures—the court bound the IG solely to the administrative record and expressly refused to consider any support for termination "not included in the Final Notice and not part of the Inspector General's termination decision." Having thus narrowed the evidence, the court concluded that OIG "did not have prima facie . . . evidence, or even a scintilla of evidence, to conclude the bases of termination set forth in the Final Notice merited finding the Plaintiff Providers were not qualified." The agency timely appealed.

## II. STANDARD OF REVIEW

"A preliminary injunction is an 'extraordinary remedy.'" *Texans for Free Enter. v. Tex. Ethics Comm'n*, 732 F.3d 535, 536 (5th Cir. 2013) (quoting *Byrum v. Landreth*, 566 F.3d 442, 445 (5th Cir. 2009)). "To be entitled to a

---

[6] In fact, the record reflects that OIG had submitted a report from a forensic firm concluding that the video was authentic and not deceptively edited. And the plaintiffs did not identify any particular omission or addition in the video footage. Moreover, the district court also suggested that there was no evidence that any of PPGC's research was federally funded, so the regulations relied on by OIG might be inapplicable. But the record actually establishes that the UTMB study was funded by the National Institute of Health.

preliminary injunction, the applicants must show (1) a substantial likelihood that they will prevail on the merits, (2) a substantial threat that they will suffer irreparable injury if the injunction is not granted, (3) their substantial injury outweighs the threatened harm to the party whom they seek to enjoin, and (4) granting the preliminary injunction will not disserve the public interest." *Tex. Med. Providers Performing Abortion Servs. v. Lakey,* 667 F.3d 570, 574 (5th Cir. 2012) (brackets and citations omitted). The party seeking preliminary injunctive relief must clearly carry the burden of persuasion on all four elements. *Id.* This court "review[s] a preliminary injunction for abuse of discretion, reviewing findings of fact for clear error and conclusions of law *de novo.*" *Texans for Free Enter.*, 732 F.3d at 537. When a court applies incorrect legal principles, it abuses its discretion. *See Atchafalaya Basinkeeper v. United States Army Corps of Engineers*, 894 F.3d 692, 696 (5th Cir. 2018).

### III.  DISCUSSION

The following discussion demonstrates that the district court erred in evaluating the evidence *de novo*, in its peculiarly asymmetrical way, rather than under the arbitrary and capricious standard, and in applying *Gee'*s reasoning to its determination of a "qualified" provider in this context. For those reasons, the court erred legally and Appellees are unable to show a likelihood of success on the merits of their claim. Accordingly, it is unnecessary for us to address the other elements of preliminary injunctive relief.

The Medicaid program exemplifies cooperative federalism—a partnership between federal and state agencies to provide medical services to needy individuals. The federal government shares the costs of funding the program with participating states. *Atkins v. Rivera,* 477 U.S. 154, 156–57, 106 S. Ct.  456, 2458–59 (1986). In exchange for federal funds, the states must

"agree[] to spend them in accordance with congressionally imposed conditions." *Armstrong v. Exceptional Child Ctr., Inc.*, 135 S Ct. 1378, 1382 (2015).

Under the Medicaid Act's "qualified-provider" provision, "[a] State plan for medical assistance must . . . provide that [ ] any individual eligible for medical assistance . . . may obtain such assistance from any institution . . . qualified to perform the service or services required . . . who undertakes to provide him such services." 42 U.S.C. § 1396a(a)(23). The Supreme Court has held that this provision "gives recipients the right to choose among a range of qualified providers, without government interference." *O'Bannon v. Town Court Nursing Ctr.*, 447 U.S. 773, 785, 100 S. Ct. 2467, 2475 (1980).

Relying on this court's decision in *Gee*, the district court concluded that the "qualified-provider" provision grants the Individual Plaintiffs a right of action to challenge OIG's termination of the Provider Plaintiffs' Medicaid agreements. 862 F.3d 445 (5th Cir. 2017). The district court then issued a preliminary injunction against the agency after holding that the plaintiffs met the criteria for extraordinary relief.

On appeal, OIG raises two principal arguments: the plaintiffs lack a private right of action because *Gee* does not control this case; and the district court abused its discretion in concluding that the plaintiffs were likely to succeed on the merits of their challenge because, *inter alia*, the court erroneously applied *de novo* review in evaluating OIG's termination decision instead of limiting its review to the agency record under the deferential arbitrary-and-capricious standard.

## A.  Private Right of Action

In *Gee*, a divided panel of this court held that, under some circumstances, 42 U.S.C. § 1396a(a)(23) can afford Medicaid beneficiaries a private right of action to challenge a state's erroneous termination of Medicaid provider

No. 17-50282

agreements. This "free choice of provider" provision mandates that "any individual eligible for medical assistance…may obtain such assistance from any institution…or person, qualified to perform the service or services required…." *Gee* involved a decision by the Louisiana Department of Health and Hospitals ("LDHH") to terminate the Medicaid provider agreements of two PPGC-affiliated clinics operating in Louisiana. 862 F.3d at 450–52. Although the OIG, as will be seen, attempts to distinguish *Gee,* we are constrained to follow that decision as the law of this circuit.

In *Gee,* LDHH advanced three reasons for terminating the provider agreements: (1) PPGC's settlement of several qui tam False Claims Act lawsuits, in which PPGC disclaimed all liability; (2) unspecified misrepresentations by PPGC in its letters to LDHH; and (3) a pending investigation of PPGC by LDHH and the Louisiana Office of Inspector General. *See id*. at 453. As in this case, PPGC and several Medicaid beneficiaries bypassed state administrative procedures and sued LDHH under 42 U.S.C. § 1983, arguing that PPGC's clinics were, in fact, "qualified" and that LDHH had failed to identify any valid ground under federal or state law for terminating the two clinics. The *Gee* majority agreed.

The court held, joining the Sixth, Seventh, and Ninth Circuits, that Section 1396a(a)(23) can provide Medicaid beneficiaries with a right of action to challenge a state's termination decision that is unrelated to a provider's qualifications. *See id*. at 462.[7] The court relied on the definition of "qualified"

---

[7] *See Planned Parenthood Ariz. Inc. v. Betlach*, 727 F.3d 960 (9th Cir. 2013); *Planned Parenthood of Ind., Inc. v. Comm'r of Ind. State Dep't of Health*, 699 F.3d 962 (7th Cir. 2012); *Harris v. Olszewski*, 442 F.3d 456 (6th Cir. 2006). After *Gee* was issued, the Eighth Circuit held that Section 1396a(a)(23) does *not* afford a private right of action. *See Planned Parenthood of Ark. & E. Okla. v. Gillespie*, 867 F.3d 1034 (8th Cir. 2017). Then the Tenth Circuit joined the circuit majority in affirming a private right of action. *Planned Parenthood of Kansas and Mid-Missouri v. Andersen*, 882 F.3d 1205 (10th Cir. 2018).

13

cited by other circuits: "[t]o be 'qualified' in the relevant sense is to be capable of performing the needed medical services in a professionally competent, safe, legal, and ethical manner." *See id.* at 462 (quoting *Planned Parenthood of Ind.*, 699 F.3d at 978). The court then determined that none of LDHH's asserted justifications for terminating the Medicaid provider agreements implicated whether the health clinics were "qualified" under this definition. *See id.* at 470.

OIG argues that *Gee* is distinguishable. Specifically, the agency suggests that *Gee* must be narrowly construed to prevent conflict with the Supreme Court's decision in *O'Bannon v. Town Court Nursing Center,* 447 U.S. 773, 100 S. Ct. 2467 (1980). In *O'Bannon*, the Supreme Court held that patients lacked a private right of action under Section 1396a(a)(23) to challenge the state agency's termination of a nursing home's Medicaid provider agreements for failure to meet statutory and regulatory standards. The Court asserted that the Medicaid Act "clearly does not confer a right on a recipient to enter an unqualified home and demand a hearing to certify it, nor does it confer a right on a recipient to continue to receive benefits for care in a home that has been decertified." *Id.* at 785, 100 S. Ct at 2475. Consequently, under Section 1396a(a)(23), a patient "has no enforceable expectation of continued benefits to pay for care in an institution that has been determined to be unqualified." *Id.* at 786, 100 S. Ct at 2476.

Over a cogent dissent by Judge Owen, s*ee* 862 F.3d at 475 (Owen, J., dissenting), the *Gee* majority distinguished *O'Bannon* for two reasons. First, the majority stated that *O'Bannon* involved a due process challenge whereas the *Gee* plaintiffs "assert[ed] the violation of a substantive right." *Id.* at 460. Second, the majority asserted that, in *O'Bannon*, the state had "decertified" the nursing center, whereas in *Gee,* "there was no decertification decision." *Id.*

at 461.  "When, as here, a state terminates only a Medicaid provider agreement, independent of any action to enforce statutory and regulatory standards, *O'Bannon* is inapposite."  *Id.*

OIG focuses on the majority's second reason for distinguishing *O'Bannon*—the absence of a "decertification decision" by LDHH.  OIG emphasizes that LDHH had "conceded that [the clinics were] competent to provide the relevant medical services" and had not sought to decertify the health centers beyond ejecting them from the Medicaid program.  *Id.* at 466.  Thus, LDHH admitted that its termination of the clinics' Medicaid provider agreements was "independent of any action to enforce statutory or regulatory standards."  862 F.3d at 461.  Texas, however, has not conceded that the Provider Plaintiffs are "qualified" in any way.  Moreover, unlike LDHH, the OIG's termination action is predicated on specific findings that federal and state statutory and regulatory standards have been violated.  In other words, the plaintiffs in this case are doing precisely what *O'Bannon* disallowed— challenging the merits of a state agency's decertification decision.

The *Gee* majority indeed indicated several times that the plaintiffs were not contesting the "the merits of [LDHH's] decertification decision."  862 F.3d at 461.  But we are unpersuaded by the distinction urged by the state.  The *Gee* majority states that "it bears repeating that LDHH has *conceded* that PPGC is competent to provide the relevant medical services to any and all *non-Medicaid patients.*"  862 F.3d at 466 (emphasis added).  Although the *Gee* majority acknowledged that LDHH's justifications for termination "might well relate to a provider's qualifications," the state had "taken *no action* to revoke PPGC's

license and has not called into question any qualification that enables PPGC to offer medical care generally." 862 F.3d at 469 (emphasis in original).[8]

Here, there is far stronger evidence in support of OIG's termination decision than the justifications offered by LDHH, but there is also no evidence that the state of Texas questions the competence of the Provider Plaintiffs or that it has taken steps to prevent the Provider Plaintiffs from offering medical care to non-Medicaid patients. In the end, the plaintiffs' claim here is roughly the same as it was in *Gee*: the state agency violated the "qualified provider" provision by excluding them from the Medicaid program for reasons allegedly unrelated to whether they are "capable of performing the needed medical services in a professionally competent, safe, legal, and ethical manner." OIG's attempt to distinguish *Gee* regarding an implied individual claim is unavailing.

This does not mean, of course, that the agency's *O'Bannon*-based arguments are frivolous. Seven judges on this circuit joined a dissent from the denial of rehearing en banc focused on the conflict with *O'Bannon*. *See Planned Parenthood of Gulf Coast, Inc. v. Gee*, 876 F.3d 699, 700 (5th Cir. 2017) (Elrod, J., dissenting from denial of rehearing en banc) (explaining that *Gee* "is directly at odds with the Supreme Court's holding in *O'Bannon*"). But this panel lacks authority to contradict the current law of the circuit.

## B. Likelihood of Success on the Merits

*Gee* controls this appeal as to the plaintiffs' right of action but the plaintiffs, and to an extent the district court, suggest that this case is merely *Gee* redux. That is incorrect. In *Gee*, the state agency's purported justifications

---

[8] *See also* 862 F.3d at 476–77 (Owen, J., dissenting) (characterizing the majority opinion as holding, "whenever a State terminates a provider's Medicaid agreement, regardless of the grounds for termination, a patient may sue to contest the termination, unless the State also precludes the provider from providing services or care to all patients, not just Medicaid recipients.").

for termination were tantamount to contending that a provider can be excluded "simply because state law says so," 862 F.3d at 466, or that a state can "simply label[ ] any exclusionary rule as a 'qualification'" to circumvent Section 1396a(a)(23)'s requirements. *Id.* at 466 (quoting *Planned Parenthood of Ind.*, 699 F.3d at 980). OIG, however, based its termination decision on, *inter alia*, a record of incriminating admissions by PPGC's own personnel that show, the agency contends, a failure to comply with federal regulations or, at the very least, a failure to comply with the ethical standards that Texas requires of Medicaid providers.

It is true that the district court purported to find "not . . . even a scintilla of evidence" impugning PPGC's qualifications. But this occurred only after the district court credited the plaintiffs' witnesses' self-serving testimony about their videotaped statements, while asymmetrically refusing to consider OIG's post-termination evidence. None of the plaintiffs' evidence, moreover, was ever presented to the agency through the standard administrative procedures or judicial review required by the Medicaid statutes.

OIG challenges the district court's procedures as facially inequitable. But the agency's principal argument on appeal is that the district court abused its discretion by reviewing the agency's decision *de novo* instead of under the deferential arbitrary-and-capricious standard required by this court's decision in *Abbeville General Hospital v. Ramsey*, 3 F.3d 797 (5th Cir. 1993). We agree that *Abbeville*'s analysis applies here: a state agency's decision terminating a Medicaid provider agreement—and the agency's determination that the provider is not "qualified"—should be reviewed like any other administrative case—on the record that was made before the agency and under the arbitrary-and-capricious standard.

No. 17-50282

However, before explaining the appropriate standard of review, it is first necessary to clarify how *Gee*'s analysis of the "qualified-provider" requirement applies to state agencies like OIG.  We then explain why the district court had to review the agency's decision under the more deferential standards.

### 1.  The meaning of "qualified"

The Medicaid Act itself does not define what it means for a provider to be "qualified to perform the service or services required." 42 U.S.C. § 1396a(a)(23).  But "Medicaid regulations allow states to set reasonable standards relating to the qualifications."  *Gee*, 862 F.3d at 462 (quoting  42 C.F.R. § 431.51(c)(2)).  And *Gee* emphasized that "states retain broad authority to define provider qualifications and exclude providers on that basis."  *Id.* at 465; *see also Detgen ex rel. Detgen v. Janek*, 752 F.3d 627, 631 (5th Cir. 2014) (explaining that states possess "broad discretion to implement the Medicaid Act").  Nevertheless, *Gee* held that a state's discretion is "circumscribed by the meaning of 'qualified' in this context."  862 F.3d at 465.

Rather than offer a comprehensive definition of what it means for a provider to be "'qualified' in this context," *Gee* instead relied on a general definition used by several other circuits.  *See id.* at 462.  This definition of "qualified," which LDHH never challenged, is "capable of performing the needed medical services in a professionally competent, safe, legal, and ethical manner." *See id.* at 462 (quoting *Planned Parenthood of Ind.*, 699 F.3d at 978). Absent further explanation, this broad statement could unduly circumscribe an agency's ability to "define provider qualifications and exclude providers on that basis," *Gee*, 862 F.3d at 465, and it conflicts with other Medicaid statutory provisions and with the interpretation of federal funding statutes.

First, the word "capable" must be construed with reference to the limiting terms "competence," "safety," "legality," and "ethics."  Being "capable

18

of" providing health services is not the same as being "qualified" to do so. Being "capable of" denotes merely the ability to perform a function.[9] In contrast, being "qualified" means "[h]aving qualities or possessing accomplishments which fit one for a certain . . . function" and, often, it means that this *fitness* is "officially recognized."[10] If being merely "capable" of providing health services—say, safely—were the standard for being a "qualified" provider, a Medicaid provider could challenge its termination by showing that it *could* have acted safely—even if it seriously or frequently failed to do so. A state agency should not have to show that a provider is *incapable* of operating appropriately to hold a provider accountable under the "qualified-provider" provision. None of the cases that have relied on the general definition of "qualified" have indicated otherwise.

Similarly, courts may not interpret *Gee* to hold that a Medicaid provider must be considered "qualified" until the state has totally barred that provider from serving the public. A literal understanding of "capable of performing the needed medical services" could lead to that interpretation, as could several of the *Gee* majority's statements in dicta. *See, e.g.*, *id.* at 465 ("While as a general rule a state may terminate a provider's Medicaid agreements for reasons bearing on that provider's general qualification to provide medical services, we are not aware of any case that holds a state may do so while continuing to license a provider's authorization to offer those same services to non-Medicaid patients."). But any such requirement would hamstring state agencies like

---

[9] *See* The Oxford English Dictionary (online ed. 2018), available at http://www.oed.com/view/Entry/27354?redirectedFrom=capable#eid.

[10] *See* The Oxford English Dictionary (online ed. 2017), available at http://www.oed.com/view/Entry/155867?rskey=k2PgDU&result=1&isAdvanced=false#eid.

OIG that have no authority to decertify health care providers generally. The Provider Plaintiffs' Texas medical licenses are regulated by the Texas Medical Board, which is a separate agency operating under separate statutory authority. *See* Tex. Occ. Code §§ 151.003(2), 152.001(a). And to the extent the Provider Plaintiffs or their affiliated health clinics are abortion providers, they are separately licensed by the Texas Department of State Health Services. *See* 25 Tex. Admin. Code § 139.1(a). Moreover, if Louisiana's failure to revoke the health clinics' licenses were dispositive, the *Gee* majority would not have needed to review LDHH's justifications for termination at all. In sum, a state's decision to revoke a health care provider's license may be sufficient, but it is not necessary in order for a state to exclude a provider from the Medicaid program.

Second, requiring a state to decertify a provider entirely before jettisoning it from the Medicaid program would also conflict with the Medicaid Act's provision of numerous grounds on which the Secretary of the Department of Health and Human Services ("HHS") or a state can or must exclude a Medicaid provider from the program. *See* 42 U.S.C. §§ 1396a(p)(1) – (3), 1320a-7. Indeed, the general exclusionary provision in Section 1396a(p)(1) authorizes a state to disqualify a provider for many reasons unrelated to violations that would require the provider to cease operating entirely. Suspension from another state health care program, for example, is one of many statutory bases upon which the Medicaid Act allows a state to exclude a provider. *See id.* § 1320a-7. The applicable regulations amplify that "a State may exclude an individual or entity . . . for any reason for which the Secretary could exclude that individual or entity from participation in Federal health care programs" and "[n]othing contained in this part should be construed to limit a State's own authority to exclude an individual or entity from Medicaid for any reason or

period authorized by State law." 42 C.F.R. § 1002.3(a)-(b). *Gee* also recognized that "[s]tates undoubtedly must be able to terminate provider agreements in cases of criminal activity, fraud and abuse, and other instances of malfeasance." 862 F.3d at 469. The Medicaid Act's comprehensive regulatory framework nowhere suggests that a provider may only be disqualified once it is deemed unfit to provide care for the general public.

Third, because the Medicaid program transfers funds to states on conditions, a "clear statement" of any mandatory condition is required by *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981), and OIG's interpretation and implementation of the regulations is valid unless "plainly prohibited" by the statute. *Detgen ex rel. Detgen v. Janek,* 752 F.3d at 631. As noted above, states have definitional latitude, and there is no federal definition of "qualified provider."

In light of this analysis, *Gee*'s holding that a state may not exclude a Medicaid provider for "reasons *unrelated* to that provider's qualifications." 862 F.3d at 462 (emphasis in original), is best read to mean that a state agency's justifications for terminating a provider must actually implicate whether the provider operates in a "safe, legal, and ethical manner" under state and federal law. A state cannot exclude a provider "for no reason at all." *Id.* at 468. Nor can a state "simply label[] any exclusionary rule a 'qualification'" and then contend a provider is unqualified on that basis. *Id.* at 469 (quoting *Planned Parenthood of Ind.*, 699 F.3d at 978). Thus, the Seventh and Ninth Circuits found violations of the "qualified-provider" requirement where states excluded providers merely because they provided abortions. As *Gee* explained, "a state may not exclude a provider simply based on the scope of the services it provides." 862 F.3d at 469.

21

To comply with *Gee,* a state agency undertaking to decide that a Medicaid provider is not "qualified" should identify regulations concerning the "safe, legal, and ethical manner" of furnishing healthcare services and point to evidence of the provider's violations.  As reflected in the *Gee* majority's analysis, this should be an easy standard for the state to meet in most cases. *See id.* at 468 ("[W]e reiterate for emphasis the unique circumstances of the instant case.").

### 2.  Arbitrary and Capricious Review

With the governing legal standard in mind, we turn to the proper standard of judicial review.  OIG contends that the district court erred procedurally by applying *de novo* review and allowing the plaintiffs to offer evidence outside the administrative record, because this court held in *Abbeville* that the "substantive adequacy and reasonableness" of a state agency's findings in administering the Medicaid Act should be reviewed by courts "using the arbitrary and capricious standard of review."  3 F.3d at 803–04.  Although the district court did not specify the standard of judicial review, the court clearly did not defer to OIG's findings.  Instead, the court distinguished the state's findings at every opportunity.  And by considering and crediting the plaintiffs' post-termination evidence, while expressly discrediting the state's witnesses, the court did not limit its review to the agency record.  This procedure violates *Abbeville*'s requirements.

In *Abbeville*, this court held that the deferential arbitrary-and-capricious standard applies to a state agency's rate-setting action under the Medicaid Act's Boren Amendment.  *Abbeville,* 3 F.3d at 802.  Federal courts are accustomed to applying the "deferential" standard to the actions of federal agencies under the Administrative Procedure Act.  *See Nat'l Ass'n of Home Builders v. Defs. of Wildlife,* 551 U.S. 644, 658, 127 S. Ct. 2518, 2529 (2007);

No. 17-50282

5 U.S.C. § 706(2)(A). Under this deferential standard, an agency's finding may only be overturned if it fails to satisfy "minimum standards of rationality." *La. Envt'l Action Network v. U.S. E.P.A.*, 382 F.3d 575, 582 (5th Cir. 2004). Courts accordingly may consider only "whether the agency action 'bears a rational relationship to the statutory purposes' and [whether] there [is] 'substantial evidence in the record to support it." *Id.* at 582 (quoting *Tex. Oil & Gas Ass'n v. U.S. E.P.A.*, 161 F.3d 923, 934 (5th Cir. 1998) (quoting *Mercy Hosp. of Laredo v. Heckler*, 777 F.2d 1028, 1031 (5th Cir.1985))). Arbitrary and capricious review is conducted on the basis of the agency record alone. *Luminant Generation Co. v. U.S. EPA*, 675 F.3d 917, 925 (5th Cir. 2012) (internal citation omitted).

*Abbeville*'s application of this deferential standard to a *state* agency was not novel; indeed, the court referred to the applicability of this standard as an "indisputable proposition" supported by a "litany of cases." *See Abbeville*, 3 F.3d at 802 & n.6 (citing cases); *see also Miss. Hosp. Ass'n, Inc. v. Heckler*, 701 F.2d 511, 517 (5th Cir. 1983) (reviewing state agency's Medicaid reimbursement plan under the arbitrary-and-capricious standard). *Abbeville* clarified that whether a state had complied with the Medicaid Act's procedural requirements was subject to *de novo* review. *Id.* at 802.[11] However, once a state agency complies with any required Medicaid procedures, "a presumption of regularity and [a] deferential standard attaches" to the agency's decision. *Id.* at 804.

---

[11] In *Abbeville*, itself, the state agency "admit[ted] . . . that it conducted no studies and made no efforts to" make the required findings. *Id.* at 806. For this reason, the court reversed the agency's reimbursement plan for procedural noncompliance without applying arbitrary and capricious review. *Id.* at 810.

23

The plaintiffs argue that *Abbeville* is inapposite because the instant case does not actually involve the appeal of an agency decision; rather, it is "a statutory claim under the Medicaid Act giving rise to a right of action in federal court under §[ ]1983." The plaintiffs contend that there is "no case law imposing arbitrary-and-capricious review on such a claim." The plaintiffs are mistaken. *Abbeville* itself involved a Section 1983 action seeking to enforce *statutory* rights. *See Abbeville*, 3 F.3d at 801 ("The Hospitals filed a § 1983 action against the Secretary of LDHH and other agency officials, claiming their actions deprived them of rights secured under the Boren Amendment.").[12] Other courts have likewise concluded that the review of state Medicaid decisions as applied to individual plaintiffs in Section 1983 cases is governed by the arbitrary and capricious standard. *See Smith v. Rasmussen*, 249 F.3d 755, 760 (8th Cir. 2001); *Brown v. Day*, 434 F.Supp.2d 1035, 1041 (D. Kan. 2006).

Contrary to the plaintiffs' assertion, moreover, this case plainly involves judicial review of an agency action. Here, OIG, the state agency empowered to investigate violations of the Medicaid program and terminate providers for noncompliance, decided to exclude the Provider Plaintiffs after finding evidence that they had violated various medical and ethical standards. The plaintiffs have sought judicial review of that termination decision. The plaintiffs' challenge is functionally equivalent to any other appeal of an agency decision. To hold that the plaintiffs' challenge could receive review in federal court without the deference due in a case brought by the Provider Plaintiffs directly would be to elevate patients' rights beyond the complex federal-state cooperative and enforcement structure of the Medicaid statute itself. Put

---

[12] Similarly, *Miss. Hosp. Ass'n.* does not cite Section 1983 but must also have been brought to enforce federal law under that provision.

otherwise, had the Secretary of HHS excluded the Provider Plaintiffs, there is no question that its decision would be subject to arbitrary and capricious review.[13]  And put otherwise again, the result the Individual Plaintiffs obtained goes far beyond their personal claims to be treated by the Provider Plaintiffs, as it prevents the state from denying millions in state funds to those entities;  this result cannot be proportional to the litigation of an individual claim, but must arise from wholesale review of agency action toward the Providers.

The plaintiffs next contend that *Gee* precludes the application of arbitrary-and-capricious review in this context because *Gee* reviewed LDHH's termination decision *de novo*.  Had *Gee* addressed this question and applied *de novo* review, we might be bound to do likewise.  But *Gee* never addressed nor was it required to or even asked to address the applicable standard of review.  LDHH's grounds for terminating the health clinics amounted to no more than unsupported suspicions of misconduct.  Unlike in this case, LDHH had done no factfinding and conceded that the providers were "qualified."  Thus, although *Gee* did not address *Abbeville*, it is consistent with the prior decision's requirements:  as in *Abbeville,* the lack of findings rendered the LDHH decision subject to de novo review.  This stands in stark contrast to the present case in which OIG made findings.

Further, not one of the circuits that have recognized a private right of action under Section 1396a(a)(23) has intimated that an arbitrary-and-capricious standard would be inappropriate.  In *Planned Parenthood of Indiana* and *Betlach*, the Seventh and Ninth Circuits had no need to address

---

[13] *See* 5 U.S.C. § 706(2)(A); *see also Nursing Ctr. v. U.S. Dep't of Health & Human Servs.*, 606 F. App'x 164, 167 (5th Cir. 2015) (reviewing whether Secretary's decision imposing sanctions on Medicaid provider was arbitrary and capricious).

this question because they dealt only with state laws, not agency decisions, that blocked Medicaid funding for abortion providers. *See* 699 F.3d at 967; 727 F.3d at 962. Likewise, the underlying issue in the Sixth Circuit's *Olszewski* decision was whether HHS reasonably construed the Medicaid Act's phrase "medical devices" to include "incontinence products." 442 F.3d at 465.[14] The state agency's determination was not properly at issue. Additionally, the Tenth Circuit's decision in *Andersen* largely parrots *Gee* in its rejection of a state agency's termination decision and likewise does not discuss the standard of review. 882 F.3d at 1236.

The plaintiffs next argue that the deferential standard is inappropriate because the Individual Plaintiffs, as Medicaid beneficiaries, have no administrative remedy and thus cannot develop the administrative record.[15] The plaintiffs also point out that *Gee* held that the plaintiffs "are not subject to . . . any administrative exhaustion requirement." *Gee*, 862 F.3d at 455. That is true. But the absence of an exhaustion requirement does not mean there can be no consequences for the provider's decision to ignore the prescribed administrative process. The absence of an exhaustion requirement does not entitle plaintiffs to *de novo* review of OIG's factual findings and conclusions.

Indeed, it is a feature—not a bug—of the arbitrary-and-capricious standard that it incentivizes providers to use the state administrative appeal process required by the Medicaid Act itself. *See* 42 U.S.C. § 1396a(a)(4);

---

[14] The court applied *Chevron* deference to HHS's construction of the act and found it reasonable. *Id.* at 470.

[15] The Individual Plaintiffs, of course, serve here as the Providers' litigation proxies, and the Providers had ample opportunity to develop the administrative record. If this deficiency ultimately operates to the detriment of the Individual Plaintiffs, *O'Bannon* recognized that Medicaid beneficiaries might well have a cause of action against their Providers for becoming decertified. 447 U.S. at 787, 100 S. Ct. at 2476.

No. 17-50282

42 C.F.R. § 1002.213 ("Before imposing an exclusion under § 1002.210, the State agency must give the individual or entity the opportunity to submit documents and written argument against the exclusion."). It is highly doubtful that Congress intended a loophole whereby providers could use patients as litigation proxies to avoid the state's remedial procedures and develop separate, potentially conflicting judicial standards of compliance. Requiring arbitrary and capricious review that is limited to the administrative record encourages Medicaid providers to pursue a state's administrative-hearing procedures in order to develop the administrative record in their favor.[16]

In an effort to apply rather than distinguish *Abbeville*, the plaintiffs alternatively contend that the district court did no more than the federal court in that case and simply disregarded OIG findings that were not "*bona fide*" or "supported by some minimum quantum of evidence." *Abbeville*, 3 F.3d at 804, 805. As explained above, however, *Abbeville* was reviewing LDHH's procedural compliance with Medicaid standards, not its substantive compliance.

In any event, there is no question that the OIG here made factual findings after viewing the videos and related evidence. On the basis of the administrative record—not the *post hoc* justifications offered by plaintiffs' witnesses in the district court—the OIG determined that video discussions "centered on clinic processes and tissue packaging rather than the abortion procedure itself; the video featured repeated discussion about the position of

---

[16] In this way, requiring the deferential standard of review could ameliorate what some members of this court saw as negative consequences of the *Gee* decision. *See Gee*, 876 F.3d at 702 (Elrod, J., dissenting from denial of rehearing en banc) ("Disqualified providers can now circumvent state law because the panel majority opinion deems it unnecessary to have a final administrative determination so long as there are patients to join a lawsuit filed in federal court.").

the fetus in the uterus, the risk to the patient, and the patient's pain tolerance." The OIG further concluded, based on the videos, that the Provider Plaintiffs at a minimum violated federal standards regarding fetal tissue research and standards of medical ethics by allowing doctors to alter abortion procedures to retrieve tissue for research purposes or allowing the researchers themselves to perform the procedures. The plaintiffs' briefing with regard to the substance of the discussions contained in the videos (as opposed to their trial witnesses' post hoc justifications) is curiously silent.

The plaintiffs finally insinuate that arbitrary and capricious review should not apply because OIG has insufficient expertise to determine the qualifications of abortion providers. On this point, the district court was also dismissive, suggesting that the Inspector General and OIG's Chief Medical Officer were insufficiently informed regarding how to perform abortions. We reject this argument. OIG is the agency that the state of Texas has empowered to investigate and penalize Medicaid program violations. The agency is in the business of saying when providers are qualified and when they are not. That the Chief Medical Officer is a surgeon—and not himself an abortion provider— does not mean that he deserves no deference when deciding whether a provider has failed to meet the medical and ethical standards the state requires.[17] It is even odder to claim that federal judges, who have no experience in the

---

[17] Here, it seems necessary to consider the appropriate deference owed to OIG outside the abortion context. It is certainly inappropriate "to bend the rules when any effort to limit abortion, or even to speak in opposition to abortion, is at issue." *Whole Woman's Health v. Hellerstedt,* 136 S. Ct. 2292, 2321 (2016) (Thomas, J., dissenting) (quoting *Stenberg v. Carhart,* 530 U.S. 914, 954, 120 S. Ct. 2597, 2621 (2000) (Scalia, J., dissenting)). To bend the rules here would be particularly imprudent. Had OIG terminated the Medicaid provider agreements of any other type of health care provider, the incongruity of allowing that provider to use patient litigation proxies to avoid administrative review and receive *de novo* review in federal court would be obvious and unacceptable.

regulations and ethics applicable to Medicaid or medical practice, much less in regard to harvesting fetal organs for research, should claim superior expertise.

In sum, the district court erred by giving no deference to OIG's factual findings and by accepting evidence beyond the agency record. The arbitrary and capricious standard applies to review of the record alone. [18]

## CONCLUSION

For these reasons, we must affirm that the Individual Plaintiffs possess a private right of action. However, because the district court apparently conducted *de novo* review of the OIG's decision, and its procedure was incompatible with the proper standard, the basis for its preliminary injunction cannot be sustained. Whether plaintiffs might establish a likelihood of success on the merits depends on application of the arbitrary and capricious standard to the administrative record alone.

We **VACATE** the preliminary injunction and **REMAND** for the district court to limit its review to the agency record under an arbitrary-and-capricious standard.

---

[18] A separate issue raised by Planned Parenthood is whether OIG could terminate Medicaid funding for all of the Provider Plaintiffs where only one, PPGC, has engaged in or contemplated fetal tissue research. State regulations authorizing action against "affiliates" of a provider are at issue. This issue becomes relevant and must be reconsidered by the district court if, on remand, it upholds the OIG's termination decision against PPGC.

No. 17-50282

EDITH H. JONES, Circuit Judge, concurring:

The panel agrees that the *Gee* decision is binding law for our circuit at present, but I urge reconsideration en banc. *Gee* is inconsistent with *O'Bannon,* and it makes no practical sense to hold that a Medicare provider charged with misfeasance by state regulating authorities may simply bypass state procedures, which are required by the Medicaid statute, and use patients as stalking horses for federal court review of its status. That the arbitrary and capricious standard of review governs such review in federal court is a second-best solution to the legal necessity of aligning our precedent with the Supreme Court's holding. Finally, despite being litigated with the trappings of the abortion debate, this is fundamentally a statutory construction case, not an abortion case. *Gee v. Planned Parenthood of Gulf Coast, Inc.,* 139 S. Ct. 408, 409 (2018) (dissenting from denial of certioriari).

Prudential and practical objections may be made to this recommendation. From a prudential standpoint, the Supreme Court denied certiorari in *Gee* in the past month, and this court rejected en banc reconsideration of the decision in 2017. Therefore, it would follow, the states of this circuit should be bound by judicial inertia to a plainly incorrect statutory interpretation. Pragmatically, there is no harm, no foul, because the nature of arbitrary and capricious review ought ordinarily shield the decisions of state authorities who claim evidentiary and legal support when attempting to sanction or terminate provider status. In my view, none of these rationales suffices.

Start with this evenly divided court's denial of en banc reconsideration. *See Planned Parenthood of Gulf Coast v. Gee,* 876 F.3d 699 (5th Cir. 2017) (Elrod, J., dissenting). At the time of that denial, the *Gee* decision claimed support from three other circuits, but the Eighth Circuit had rejected the

creation of a patient's implied private right of action under Section 1396a(a)(23). *Compare Planned Parenthood of Ariz., Inc. v. Betlach*, 727 F.3d 960 (9th Cir. 2013); *Planned Parenthood of Ind., Inc. v. Comm'r of Ind. State Dep't of Health*, 699 F.3d 962 (7th Cir. 2012); *Harris v. Olszewski*, 442 F.3d 456 (6th Cir. 2006) (all finding a private right of action), *with Does v. Gillespie*, 867 F.3d 1034 (8th Cir. 2017) (rejecting a private right of action). Importantly, however, this court's even split indicated our recognition that the statutory interpretation issue posed in *Gee* is seriously debatable. A refusal to vote a case en banc under such circumstances is a victory of sorts for the panel decision, but it reflects no endorsement by the majority of active judges. Reconsidering the en banc decision, especially in light of the Supreme Court's recent action, would secure a clear majority decision on this surely recurring issue.

In December 2018, the Supreme Court declined certiorari in *Gee* and the Tenth Circuit's *Andersen* decision, both of which implied a patient's private right of action to challenge Medicaid providers' regulatory terminations. *See Planned Parenthood of Kansas v. Andersen,* 882 F.3d 1205 (2018). A conflict exists with the Eighth Circuit's contrary holding, yet the Supreme Court left in place the circuit conflict. It is a fair bet that the Court's avoidance indicates considerable uncertainty about the statutory issue. To restore the uniformity of federal law, the conflict must eventually be addressed. Until that happens, three different courses of action are afforded to Medicaid providers in different states. In states where no circuit court decision has approved private plaintiffs' ability to challenge the providers' sanctions, the providers must repair to Medicaid-required state administrative and judicial procedures. In the Tenth Circuit, providers may use private plaintiffs' federal court suits, level of federal review undetermined, as an alternative to undergoing state-crafted

procedures. And in this circuit, providers have alternative recourse to private plaintiffs' suits under the arbitrary and capricious standard of review. Tens of thousands of provider entities are subject to the Medicaid program's detailed scheme of integrated federal and state regulation.

That Planned Parenthood providers achieved recognition of implied private plaintiffs' actions should not detract from the program-wide uncertainty spawned by this circuit conflict. Equally to the point, the lower courts remain obliged to undertake careful statutory review while the issue is undecided, especially if the statute, properly construed, offers providers no alternative federal court remedy. The Court's denial of certiorari, in other words, strengthens the propriety of this court's reconsidering *Gee* en banc.

The pragmatic argument for denying en banc relief would seem to include two parts. This court's adoption of the deferential arbitrary and capricious standard means that state authorities will ordinarily be able to defend their program termination decisions successfully in federal court, reducing the friction between federal courts and state Medicaid administrators. Thus, it would be argued, the cost of reconsidering *Gee*, especially if *Gee* was correctly decided, is higher than the cost of federal litigation pending a definitive Supreme Court decision. But there is a second wrinkle here in that whether to apply an arbitrary and capricious standard is a *res nova* decision by this panel made necessary by *Gee*. The parties strenuously disputed the standard of review. As long as a circuit split persists, other courts weighing in on the standard of review may disagree with this panel's decision. Following the *Gee* case thus entails ongoing legal uncertainty.

Another pragmatic consideration, however, favors en banc reconsideration: the complexity and cost to state agencies that administer and regulate Medicaid. The program is already one of the most expensive

components of state budgets.  Regulating providers comprises comprehensive federal and state medical, and ethical dictates as well as parameters for facilities that provide patient care.  Authorizing lawsuits by patients to challenge their providers' terminations burdens state agencies with redundant and intrusive oversight while the high cost of federal litigation displaces more efficient uses of state resources.  As Justice Thomas also noted in his dissent from denial of cert., "the looming potential for complex litigation inevitably will dissuade state officials from making decisions that they believe to be in the public interest." 139 S. Ct. at 409.  State courts, moreover, are well suited to handle these cases based on their more intimate familiarity with the agencies, the regulation of the practice of medicine, and state administrative law—as was contemplated in the Medicaid statutes' prescription of coordinate state responsibilities for the program. If *Gee* is incorrect, these practical costs will be avoided.

Having explained why there should be no impediment to our rehearing this case en banc in order to reconsider *Gee,* I repeat briefly the arguments that others have fulsomely developed.  *Gee* is inconsistent with the Supreme Court's decision in *O'Bannon* and in tension with numerous other provisions of the Medicaid statute.

Judge Owen, dissenting in *Gee*, argued that *O'Bannon* precluded the individual plaintiffs' assertion of a private right of action to challenge LDHH's termination decision.  *See* 862 F.3d at 475 (Owen, J., dissenting).  The majority opinion asserted that in *O'Bannon,* "the patient-plaintiffs' injuries were alleged to stem from a deprivation of due process rights," and "[i]n contrast, the Individual [*Gee*] Plaintiffs here assert the violation of a substantive right." *Id.* at 460(citations omitted).  Judge Owen pointed out the fundamental logical flaw with this reasoning:  the majority "fail[s] to appreciate that there is no

right to due process unless there is a substantive right that may be vindicated if adequate process is accorded." 862 F.3d at 475. The majority completely missed the dissent's primary point that *O'Bannon* rejected the notion that Section 1396a(a)(23) creates any substantive liberty or property right. *Id.* at 476.

Judge Owen criticized the majority's broad assertion that only a total termination of a Medicaid provider from all medical services would render the provider "unqualified" for purposes of Section 1396a(a)(23). She cited, *inter alia,* Section 1396a(p)(1), a provision that authorizes a state to "exclude any…entity [from Medicaid] for any reason for which the Secretary could exclude the…entity from participation in [several federal programs listed]." And she referenced multiple other reasons justifying state termination decisions under the Medicaid statute itself. *Id.* at 477.

Judge Owen also rebutted the majority's claim that in *O'Bannon*, the state had "*totally*" decertified the nursing center, whereas in *Gee,* "there was no decertification decision." *Id.* at 472. The majority concluded, "[w]hen, as here, a state terminates only a Medicaid provider agreement, independent of any action to enforce statutory and regulatory standards, *O'Bannon* is inapposite." *Id.* The majority's error was a "shaky" basis for distinguishing the Supreme Court precedent, according to Judge Owen, because the Court never specified that the nursing home had been totally decertified by the state. 862 F.3d at 483.

Six other judges on this circuit found Judge Owen's dissent sufficiently persuasive to join a dissent from the denial of rehearing en banc. *See Planned Parenthood of Gulf Coast, Inc. v. Gee*, 876 F.3d 699, 700 (5th Cir. 2017) (Elrod, J., dissenting from denial of rehearing en banc) (explaining that *Gee* "is directly at odds with the Supreme Court's holding in *O'Bannon*"). And Judge

No. 17-50282

Elrod's dissent added that "the panel majority opinion's reasoning is not only at odds with *O'Bannon* but also with the entirety of the statutory framework in 42 U.S.C. Section 1396a." 876 F.3d at 701.

There are other reasons for rejecting *Gee.* The Eighth Circuit held in even more detail, albeit in a split decision, that Section 1396a(a)(23) confers no private right of action on patients concerning the termination of a Medicaid provider's state agreement, because to do so would place that provision in conflict with related Medicaid provisions. *See Does v. Gillespie,* 867 F.3d 1034, 1041–1043 (8th Cir. 2017) (referring to the lack of an *individual* entitlement conferred by the provision itself and 82 related provisions governing State duties to the federal program; the availability of other means to enforce the State's obligations under the Medicaid Act and the resulting likelihood of conflict between the implied individual remedy and a provider's administrative and state judicial remedies; and the "aggregate" or "substantial compliance" nature of the federal government's oversight duties). All of these structural indications, Judge Colloton explained, conflict with the requirement set out in *Gonzaga v. Doe,* that a plaintiff relying on federal law to underpin a Section 1983 case must show that "Congress clearly intended to create an enforceable federal right." *Does,* 867 F.3d at 1039 (citing *Gonzaga Univ. v. Doe,* 536 U.S. 273, 283, 122 S. Ct. 2268 (2002)).[1]

In *Andersen,* Judge Bacharach dissented on the basis that Section 1396a(a)(23) does not "unambiguously" provide an implied private right of action, contrary to *Gonzaga,* because any "right" conferred on patients in that provision conflicts with the state's broad rights under Medicaid "to

---

[1] Judge Shepherd, concurring in the Eighth Circuit decision, echoed Judge Owen's sentiments about *O'Bannon* as an independent ground for rejecting plaintiffs' implied private right of action.

exclude an individual or entity from Medicaid for any reason or period authorized by State law." 42 C.F.R. § 1002.3(b), interpreting 42 U.S.C. § 1396a(p)(1). *Andersen,* 882 F.3d 1205, 1243–45 (10th Cir. 2018). Judge Bacharach would accordingly distinguish between situations where a state attempted to prohibit all Medicaid funding to abortion providers (contrary to law) and situations like that in *Andersen,* and in this case, where neutral regulations were violated by the providers.

Finally, Justice Thomas and two colleagues noted the "significant implications" of the question "whether Medicaid recipients have a private right of action to challenge a State's determination of 'qualified' Medicaid providers" under Section 1396a(a)(23) and Section 1983. *Gee*, 139 S. Ct. at 408. Justice Thomas noted the threats to state administration of Medicaid programs, not only from the financial burdens of litigation and deterrence of sound management decisions, but also because private patients' suits "give Medicaid providers 'an end run around the administrative exhaustion requirements in [the] state's statutory scheme.'" *Id*. at 409, (quoting 876 F.3d at 702 (Elrod, J., dissenting)).

Given the still-unsettled state of the law and the absence of precedential or pragmatic disincentives to rehearing en banc, these persuasive arguments deserve the attention of our full court. I respectfully request rehearing en banc to reconsider whether Section 1396a(a)(23) creates a private right of action on behalf of Medicaid patients to challenge the termination of their providers' contracts by the States.